*Francis T. Hord,* for the appellant.

*A. H. Bryan,* for the appellee.

---

PEPPER *v.* THE STATE *ex rel.* HARVEY.

PLEADING—RELATOR—AUDITOR OF STATE.—In actions to recover money due to the State from a county treasurer and his sureties, the Auditor and not the Treasurer of State should be the relator.

OFFICIAL BONDS—EXECUTION OF.—Where an official bond is drawn up and certain names are inserted in the body of it as obligors, and a part only of such names are afterwards signed to it, the obligation will not become binding upon them until it is executed by all, on the ground that the presentation of such bond, so prepared, to such persons (named in it) as signed it, amounted to a representation that all the persons named in it would sign it before its delivery.

SAME.—Where such a bond is presented to such a person for his signature, by the principal in the bond, and such person signs it, there being several signatures attached to it already, and it afterwards appears, from some cause, that the bond is not binding on some or any of the persons whose names preceded his, it should be held not binding upon him, unless it be shown that he had knowledge of its invalidity as to the others at the time he signed it.

SAME.—Where such a bond is presented by the principal in it to several persons, and their signatures as sureties for him are solicit-

Pepper *v.* The State ex rel. Harvey.

ed by him, and he represents to them severally that, before its delivery he will procure the signatures of a certain number of other persons, as sureties, or of certain named persons, and some of them are *induced* by such representations to sign it, and others sign it upon *condition* that such other signatures shall be procured, and others sign it in *consideration* that such other signatures shall be procured, and such other signatures are not procured, these several classes of persons, in defence to an action upon such bond, may show these facts.

SAME—BOND OF COUNTY TREASURER.—Where such bond is the bond of a county treasurer, it must be approved and accepted by the board of commissioners of the county, and if such board appoints no person as agent to procure its due execution, and on its presentation institute no examination into the mode of its execution or the sufficiency thereof, it is reasonable to assume that such board accepted it upon the faith of the fair dealing of the principal in procuring its execution, and thus far at least adopted his acts as their own, and as a substitute for the inquiry they should have instituted on its presentation for their approval.

SAME—DUTY OF COUNTY BOARD.—In reference to such bonds it is the duty of the board of commissioners, before accepting or approving them, to ascertain that the sureties possess the qualifications required by law, and that the bonds were duly executed by those whose names are signed to them, and that the sureties are in the aggregate worth enough to make the bond sufficient in that respect.

APPEAL from the *Franklin* Common Pleas.

HANNA, J.—The State on relation of *Harvey*, State Treasurer, brought an action on the bond of *Batzner*, county treasurer of *Franklin* county, for defalcation. Default as to *Batzner*; appearance for the sureties. Demurrer to the complaint for the following reasons:

1. That the plaintiff has no capacity to sue.

2. Defect of parties plaintiff, in this, that the Auditor of State is the only officer having legal capacity to sue.

3. The complaint does not contain facts sufficient to constitute a good cause of action.

These appellants also file a separate demurrer to each of the three paragraphs of the complaint. Demurrer sustained to the first and overruled as to the other paragraphs. Answers by all the defendants separately or together, amounting to *non est factum*. Reply: general denial; trial by the Court; finding against all the sureties but one *Grinkmier*. Motion for a new trial overruled, and judgment on the finding for over 25,000 dollars, and this appeal prosecuted to reverse that judgment.

The reasons for a new trial are:

1. The Court erred in overruling the demurrer to complaint.

2. The judgment is contrary to the evidence.

3. The judgment is contrary to law.

4. The judgment should have been for the defendants below.

The errors assigned are precisely those named in the motion for a new trial. The evidence is set out in a bill of exceptions. All the sureties, or nearly all, were examined under oath as witnesses.

The only questions raised and discussed in this Court, are:

1. Is the suit well brought in the name of the State on relation of the State Treasurer?

2. Is the bond binding on the sureties under the circumstances shown in the evidence?

As to the first question, we are of the opinion the suit should have been upon the relation of the Auditor of State to recover the funds, as shown here, due the State, for the plain and simple reason that the statute so provides in the "act prescribing the powers and duties of Auditor of State."

"Sec. 2. He shall, * * * 6th. Institute and prosecute, in the name of the State, all proper suits for the recov-

ery of any debts, moneys or property of the State, or for the ascertainment of any right or liability concerning the same.

"7th. Direct and superintend the collection of all moneys due to the State, and employ counsel to prosecute suits at his instance, on behalf of the State."

" Sec. 7. Whenever any officer or other person shall render an account to and make settlement with the Auditor, as in this act required, and shall fail to pay over to the Treasurer of State the amount to be paid by such officer or person into the State treasury, or to such person as shall be entitled by law to receive the same, within the time prescribed by law, or if no time is prescribed by law, then within the time specified by such Auditor; the Auditor, upon being notified by said Treasurer, or otherwise, of such failure, shall institute suit for the recovery of the amount due and unpaid." 1 R. S. pp. 147–8.

In this case, it is averred, a settlement with the Auditor had been made.

Perhaps it is useless to search for the reasons for the passage of said statutes; but it appears to us that they are so obvious, that we will, for a moment, advert to them. Any mode of auditing, adjusting, settling and keeping a record of public accounts, and of receiving, keeping and disbursing the public moneys, was intended to be based upon what is called a system of checks and balances. The Auditor of State keeps an office in which settlements and adjustments, &c., are made, of claims against and in favor of the State. In that office ought to appear the exact sums in the hands of the Treasurer of State belonging to any particular fund. At the time this suit was instituted no funds could properly get into the State treasury except upon a certificate of the Auditor of State to the Treasurer, stating the amount to be paid and to what fund, and upon a draft by said Auditor, in favor of the Treasurer upon the person who is to make the payment.

Pepper *v.* The State ex rel. Harvey.

Acts 1859, p. 227, § 6. Further, it is only in the Auditor's office that, in the first instance, a statement of the accounts of county treasurers with the State can be found. Sec. 2, part 2d, 1 R. S. p. 146. It is true, the balance is certified to the Treasurer of State. It is not by virtue of that mere balance that the suit is maintained, but upon a copy of the account certified by the Auditor. In a word, the Auditor superintends the fiscal concerns of the State. *Id.* 147. This he might not be able to do if the Treasurer could sue for and collect moneys belonging to the State in his name. We have decided that a county treasurer can not, of his own volition, sue his predecessor. *Snyder et al.* v. *The State ex rel.*, at this term.

As to the second question made, we will notice the evidence bearing upon it.

The evidence of *Grinkmier*, one of the sureties, was positive that he had not signed the bond nor authorized any other person to place his name to it; that he could not read nor write, and it was shown that the hand writing was *Batzner's*. Upon this the Court found that as to said surety the signature was a forgery.

*Levi W. Buckingham*, one of the sureties, testified that his signature was thus obtained: he asked *Batzner* if *George Berry* and *Daniel D. Jones* were going to sign, and he said they were. He also said that he intended to get a hundred good men on the bond. *Buckingham* then signed, and was *induced* to do so by having the assurance of *Batzner* as to the number, and the particular persons he expected to obtain as sureties on the bond. To *Auguste Pepper*, another appellant, *Batzner* said he must or would have a hundred names on the bond; and because of this pledge *Pepper* signed. Was not informed what the paper was for; supposed it was for the character of the man. *Walter* was assured that *Batzner* intended, in addition to the persons on his bond for the term

then expiring, to get a hundred good men; thinking, in that case, there could not be much danger, he signed also. *Schroeder* was told by *Batzner* that he had to have a hundred good men on it, and on these *conditions* he signed the bond. *Henry Berry*, knowing that *Batzner* had promised to get a hundred good men on his bond, asked him if he intended to redeem his pledge. He replied he did so intend, and, if necessary, he would get two hundred. *Berry* then told *Batzner* if he would get one hundred good men on the bond he would sign it. He promised, and *Berry* signed. *Simpson Calfee* was promised if he would put his name down a hundred good men should be obtained to sign the bond also; and he swears he signed by means of this *inducement*. To *John H. Quick, Batzner* promised he would get a hundred good men on the bond before he presented it to the commissioners. To *John Martin* he declared he would have a hundred good men on the bond before he attempted to file it. He then signed with that *understanding*. *Alther* was promised not less than two hundred names on the bond, and on that consideration he signed it. To *Adam Felz, Andrew Grob* and *David V. Johnson* he made the same pledge—that he would get a hundred sureties.

The evidence of two of the county commissioners is in the record. The record of the board shows that the bond was approved on the 3d of *November,* 1862, with the names of the appellants attached, and those, also, of *Batzner* and *John Grinkmier*, in all, thirty-one names. The testimony of the commissioners is that, after the bond had been presented for approval, it was rejected as insufficient. *Batzner* took it away and returned with additional names. Among those added was that of *John Grinkmier*. The new names include that of *David V. Johnson*, and four others below it. That of *Witt* appeared after it.

These are the substantial facts upon the point in question. Neither *Geo. Berry* nor *Jones* signed the bond. The sureties

Pepper *v*. The State ex rel. Harvey.

were not present before the county board to execute or acknowledge the execution of said bond. *Batzner* had procured the signatures at various places in the county and on divers days.

There is no contest about *Grinkmier* having been properly discharged.

The other sureties appear to be divided into three classes, such as signed after *Grinkmier;* such as affixed their signatures in view of the representations and motives heretofore set forth, as shown by the evidence; and such as signed without having been so influenced.

There are many old authorities to the effect that, if a bond is drawn up with the names of several persons inserted in the body of it, as the intended obligors, and it is signed by a part only of those persons, it is not binding upon them, upon the theory that the presentation of the instrument to said persons, so prepared, amounted to a representation that all the persons whose names were so inserted were to become likewise bound. See *Fletcher* v. *Austin,* and authorities cited, 11 Ver. 449; *Sharp* v. *The United States,* 4 Watts 21.

It seems to us very clear, in view of this principle, that the presentation of this bond to *Witt,* who signed after *Grinkmier,* was as effective a representation that the latter was to be a co-obligor with said *Witt,* as would be conveyed if his name had been in the body of the bond. If, in the latter instance, the signature would not be binding on one unless all signed, so we think in this case, *Witt* would not be bound unless all those names preceding his were also bound; provided the fact that the bond was not presented by the obligee does not vary the rule; a question which we will hereafter examine. *United States* v. *Lefler,* 11 Peters 88; *Luly* v. *The People, April* number Amer. L. Reg. 344. This latter was a suit upon a bond of a master in chancery, in which it appeared that the name of one *Heaton* was first in order as signed and recited in said

bond, as surety, and that it was a forgery; that it so appeared when presented to and signed by *Luly*, who was the next surety. The bond was joint and several. The Court say: "Although we have not been referred to, nor have we met with, a case precisely in point, yet we think upon principle, this should constitute a good defence to the action on the bond. By a fraud practiced upon the defendant, * * he was made to assume a different and greater liability than he intended, or supposed he was assuming, when he executed the bond."

As to those who affixed their signatures, after the representations, or promises and pledges made by *Batzner*, as heretofore alluded to, a part of whom stated that they were so *induced* to sign; a part that such was the *condition* upon which they signed, and still others that such was the *consideration* of their signature, it is more difficult to determine whether they should be considered as bound by their acts.

It is made the duty of a person, chosen to the office of county treasurer, to execute his official bond with sureties to the acceptance of the board of county commissioners. 1 R. S. 1852, p. 499. Such bonds are made payable to the State of *Indiana*. *Id.* 166.

The execution of a bond, involves the signing, sealing and delivering thereof. As these bonds could not be delivered to the State—the obligee; the law names officers or tribunals to whom they can be delivered; namely, first, to the acceptance of the board of county commissioners, and then to be filed in the clerk's office of the county. *Id.* 166, secs. 4 and 5.

The bond is, among other things, to secure the amount of money which may come into the hands of the treasurer during his term of office. As this would include money belonging to the county, as well as to the State, which he might receive therefor, the said board is made the actors in accepting his bond; because such board has the general control and man-

agement of the fiscal affairs of the county, and in auditing the accounts of officers having the care, collection and disbursement of the funds of the county. *Id.* pp. 224, 227.

We suppose that, under these provisions, the clerk of the Circuit Court is the mere custodian of the bond, and the county board acts for the obligee in accepting it. What, then, is the duty of said board in accepting a bond? Clearly, to carefully consider the sufficiency of the bond, as to its legal construction, as to the amount thereof, and as to the solvency of the persons whose names appear as sureties. About this there will, we suppose, be no controversy. Now, it is equally clear that a bond might be prepared in due form, in a sum sufficiently large; the names thereto attached might represent persons owning property amply sufficient to meet any liability that might arise under it; and yet, if, in point of fact, any legal reason existed why the persons whose names so appear are not really bound thereby, the security would be worthless. The names might be forged, or might represent persons of ample means, but resting under a disability to so contract; or the signatures may have been obtained thereto, and the instrument placed as an escrow in the hands of a third party, not to be delivered until after the performance of a precedent condition; such as the execution by the principal of a bond of indemnity to those who signed as sureties, and those surreptitiously obtained by the principal and presented for acceptance.

We presume, in neither of these cases would an acceptance merely, bind the sureties, nor would the county board be in the strict line of duty by accepting without inquiry. If not, how, or in what, would these instances differ, in principle, from the facts involved in the case at bar? In the one instance the persons did not attempt to contract; in another they were willing to contract, if they were secured; in another they had no capacity to contract. It will be seen

that in each instance, the acceptance of the bond would be unavailing as a security for the funds that might come into the hands of the treasurer, because the bond had not been executed by parties capable and willing to contract. The principle, then, upon which the defence in each of the supposed cases would rest, would be the non-execution.

Waving, for the present, the consideration of the effect of the circumstances under which several of the signatures were procured, we will proceed at once to the examination of the most difficult point which is presented by the facts in the case; namely, that growing out of the relative position of the parties to the bond and those who acted in the premises.

The State could make no representation, nor, as before stated, accept the bond. The duty of accepting is by law devolved upon the board of county commissioners. If the board is, strictly, but the agent of the obligee in accepting said bond, it might be gravely doubted whether said agent could confer upon another any part of the powers so delegated. If the said board is not a mere agent, then, perhaps, another might be, by said board, invested with certain powers connected incidentally with the acceptance of said bond; such as might conveniently insure the due execution thereof. If the board is the mere agent of the State in the matter, without the right to invest sub-agents with authority, then, it appears to us, that, whether acting in a ministerial or a judicial capacity, there could be but one course in accepting a bond, and that would be to institute inquiry and pass upon all questions connected with its due execution, including the delivery thereof. It would thence appear to follow, that the conclusion of such an inquiry would form a proper subject for a record. That record, to be conclusive upon the parties sought to be bound, should show that due preliminary steps had been taken to make them parties to it. The safety of the various funds, passing into the hands of a treasurer, as

Pepper *v*. The State ex rel. Harvey.

well as the interest of private persons, would seem to imperatively require some such course as this. Indeed it is, we believe, in various counties of the State, the usage, under said statute, and, we are inclined to think, the safest construction thereof.

But, we will proceed to examine another construction sought to be placed upon these statutes, and the powers and rights of the county boards; and in the event this construction, contended for, shall be conceded, it may be that a conclusion upon the point above indicated, may not be necessary.

It is insisted that the board of county commissioners adopted the acts, and consequently the representation of *Batzner*, in procuring signatures to said bond, as their acts, &c.; that they had the power, in that respect, to constitute him their agent.

Looking to the fact that, the bond of the county treasurer is not alone to secure the separate interests of the State, the obligee named, by law therein, but also to secure other interests, over which said board have almost exclusive control; we are inclined to the opinion that, as to questions connected with the execution and approval of said bond they have some primary powers and rights; such as the right to appoint a person, for instance their clerk, the auditor, to see to the due execution of the bond, that it is properly framed, &c., before presentation. If this is so, we see no valid reason why they might not make the principal obligor in the bond their agent for such purpose. If they could do so before he acted, why could they not adopt his acts afterwards? For instance, did they not adopt the result of his acts in this case? That is, they accepted the bond to which he had procured signatures, without inquiry as to the genuineness of the signatures or the means that had been resorted to to procure the same. Upon what theory did they act, upon what principle did they proceed in so accepting said bond? Certainly, so far as the

obligors were concerned, upon the theory that the principal represented them in the presentation of the said bond. And we must assume either that they were entirely derelict in their duty as to the proper inquiry in reference to the execution of said bond, or that they accepted it upon the faith of the fair dealing of *Batzner* in procuring its execution. If they relied upon his acts, they, that far, adopted them as a substitute for the inquiry they should have made, and, in adopting the result of his acts, they can not get rid of the means he used to procure such results. *Judah* v. *The Vincennes University*, 16 Ind. 70.

This brings us to a proper point to inquire as to the effect of the promises, pledges and representations which *Batzner* made. Perhaps it is true that, under the circumstances of this case, *Batzner*, in making said representations and promises, acted without authority from the county board, and that in presenting said bond he was acting for himself and those who signed it. It might be a very serious question whether, in presenting it before the fulfillment of the conditions or redemption of pledges upon which signatures were procured, *Batzner* merely exercised his authority as the agent of his co-obligors; if the board could have accepted it without adopting his acts.

Judge *Redfield*, in the American Law Register, in a note to the case of *Luby* v. *The People*, says:

"The law seems to be well settled that a bond or other instrument, not negotiable, when one or more of the sureties sign with the assurance that the paper is not to be delivered, as a binding contract, until all whose names appear in the body of the instrument have become parties to it, will not be binding unless this condition is complied with." *April* No., 1863, p. 346 and note.

What would have been the practical result if they had not relied upon his good faith in procuring and presenting said

bond? They would have, in the regular discharge of their duty, instituted an inquiry into the question of the execution of the bond, as well as that which they did inquire of; namely, its sufficiency.

This inquiry, we must believe, would have developed the facts that are now set up in defence and defeated the acceptance of the bond, if they are now sufficient to discharge the liability of said obligors.

That they are sufficient as to all who signed, with the understanding, or upon the condition, that the bond was not to be presented, consequently not to become operative, until certain other persons signed it, or until a certain number and quality of men signed it, is well established by the following authorities and cases. *The United States* v. *Sheffler*, 11 Peters, 86; *Pawling* v. *The United States*, 4 Cranch, 219; *Fertig* v. *Buchu*, 3 Barr. Penn., 308; *Sharp* v. *The United States*, 4 Watts, 22; *Lovett* v. *Bowne*, 3 Wend., 380; *Fletcher* v. *Austin*, 11 Vermont, 448; *Bibb* v. *Reed*, 3 Alabama, 88; 2 Mumford, 33; 7 Pick, 91; 2 Leigh, 157; 1 Barn. & Cress., 682; 4 Johns. R., 230; *Johnson* v. *Baker*, 4 Barn. & Ald., 440; 2 Harrington, 396; 7 Ohio, 354; *Duncan* v. *The United States*, 7 Peters, 435.

In 2 Greenleaf's Ev., sec. 297, it is said that: "The *delivery* of a deed is complete, when the grantor or obligor has parted with his dominion over it, with *intent* that it shall pass to the grantee or obligee, provided the latter assents to it, either by himself or his agent." To which, is a note, citing a great many cases. See, also, 34 N. Hamp., 474, and authorities cited, and 13 Ohio State Rep.; 2 Black. Com., 307; 4 Kent, 254; 13 Pick., 75; 1 Johns. cases, 114; 2 John. R., 274; *id.* 230.

In the case in 11 Peters, the suit was upon a bond given by one *Curtis*, as principal, and *Leffler* and others as his sureties for the performance of his duties as collector of taxes, &c. Judgment had been taken against said *Curtis*. Part of said sureties pleaded *non est factum*. To support the issue made

as to the execution of the bond, the deposition of *Curtis*, the principal, was offered in evidence by the surety, was objected to, but admitted, and the judgment was in favor of such surety, and affirmed in the Supreme Court of the *United States*. In the reports, the statement of the facts of the case shows what was contained in the deposition, but does not show whether there was any other evidence upon that point. The Supreme Court decided that, the evidence was properly admitted, and, we think, that from the opinion it may be inferred that said evidence was material in the case, perhaps decisive thereof; and was as follows: "The deposition stated that *Jacob Leffler* and *Reuben Foreman*, executed the bond under the impression, and on the condition that the deponent could procure the signatures of other persons to the same, and they were not so procured." It appears to us, from the whole opinion, that the judgment would not have been affirmed if the facts stated by the witness had been thought insufficient to discharge the sureties.

The case in 4 Cranch, was also on the bond of a collector. The plea by the sureties was that the bond was signed by them and delivered to the principal obligor as an escrow to be by him safely kept, upon condition that if other persons named in the face of the bond should execute it, then it should be delivered as their deed, &c. Issue being joined, there was a demurrer to the evidence, and the Supreme Court of the *United States* say that the judgment on the demurrer ought to have been for the defendants. That evidence showed that the first surety who signed did so on the condition that certain other persons named should also sign; that when the next three persons signed, one of them inserted, in the body of the bond, the names of the persons whom the principal and said surety stated were to sign; and, calling upon the witnesses to take notice that others were to sign, said, "we

acknowledge this instrument of writing, but others are to sign." Those others did not sign.

In the case in 3 Barr., the sureties on the bond of a sheriff brought suit on a bond, which they alleged was executed by certain persons to indemnify them as such sureties. The defence was that, the bond was never delivered because all the persons that were to sign it had not done so. The evidence was very clear that, it was not so signed nor was it delivered; more so, perhaps, than in this case. We refer to the case for the purpose of alluding to the language of the Court, as follows: "It would certainly make a great difference to the defendant whether he was bound in company with eleven others in this bond of indemnity, or with a less number. * * * If the defendant in executing the bond, expressly stipulated that it should not be delivered up until twelve names were obtained, and the plaintiff's agent so provided; the bond was in his hands but in the nature of an escrow, and if the condition was not performed, it was never legally delivered and so was never the defendant's deed."

The point in the case in 3 Wendell, like that in 11 Peters, was upon the admission of the evidence of the co-obligor in reference to the delivery of the bond, but, like that, the reasoning, it must appear to us, in the case supports the view we have taken of the case at bar. The Court say that: "If a bond be signed, and put into the hands of the obligee or a third person, on the condition that it shall become obligatory upon the performance of some act by the obligee, or any other person, the paper signed does not become the bond of the party signing the same until the condition precedent be performed. Until then there is no contract."

In the case in 11 Vermont, one *Fletcher*, being sheriff, had appointed one *Parkhurst* his deputy, who presented him with a bond to secure the performance, &c., in the body of which the names of seven persons appeared as sureties; but two

had signed. *Non est factum* pleaded by those two. Proof admitted that when the bond was signed by said two persons they delivered the same to said *Parkhurst* and directed him not to deliver it to the plaintiff until it was also executed by all the other persons, &c., and that it was not so executed until after default; but there was no evidence that said *Fletcher* was informed of the facts, &c. There was a verdict and judgment for the defendants, in which the Supreme Court, in affirming the same, say: "As to the two who first signed, it is evident that the bond was never delivered with their consent. They might require such terms and conditions to be complied with as they thought proper before the deed should take effect as their deed." * * * * "The conclusion is that they never agreed to become sureties for the acts of the principal unless others should become jointly sureties with them."

The case cited from 3 Alabama, was a suit on an administrator's bond, in which the sureties pleaded a special *non est factum*, and that the bond had been by them delivered to the principal, but was not to be delivered to the obligee only on the condition that the same should be executed by, &c., as co-sureties, and on that condition said principal was to deliver the same to the said obligee as the deed of said sureties; that said other persons did not sign, &c., but said deed was, by the principal, delivered, &c. On the trial the defendants had judgment, in which the Supreme Court, in giving judgment of affirmance, say:

"The defendants were the sureties of one *Whitman*, as administrator, and delivered the bond to him on the condition, that if another person signed it as co-surety, it was then to become their deed. It is urged that the conditional delivery could not be to the principal obligor, but to operate as a conditional delivery it must have been made to a stranger." * * * "Delivery must be by the obligor himself, or by some

one authorized to act for him. In this case, the efficacy of the delivery of the bond unconditionally by *Whitman* must depend on his authority to do the act, and it would seem impossible to hold that an authority to another to deliver a bond, only upon the performance of a condition, was an authority to deliver absolutely;" and again: "We are satisfied that on principle there can be no difference between a conditional delivery to a stranger, or to a co-obligor; that in either case the deed can not be operative until the condition is performed, and such is clearly the weight of the authority at the present time. It was also urged, on the ground of public policy, however the law might be in other cases, that, in cases like the present, where infants and creditors were concerned, and the due execution of the bond entrusted to a public officer, no conditional delivery could be made. We can see no reason for such a distinction. The judge of the County Court is, by law, appointed to take the bond, and it is his duty not only to be satisfied that the sureties are able to respond in damages if called on, *but also to know that it has been executed by them."*

In the case cited from 7 Peters, the suit was upon an official bond, in the body of which was the name of the principal obligor and three sureties—but executed by two only. The defence was that those who signed did so with the stipulation and understanding that another person was also to sign it, who had never done so. The Court said that: "It is a principle of the common law, too well settled to be controverted, that where an instrument is delivered as an escrow, or where one surety has signed it on condition that it shall be signed by another before its delivery, no obligation is incurred until the condition shall happen."

We have also before us a copy of the manuscript opinion of Judge *Betts*, of the southern district of *New York*, in a case of *Law & Conoon* v. *The United States*, delivered *July 2*,

---

Pepper *v.* The State ex rel. Harvey.

---

1860, in a proceeding by them, in equity, to have declared
void a bond, purporting to have been executed by them, as
sureties of one *Fowler*, deputy post-master at *New York*. It
appears from said manuscript, that the allegations in the bill,
so far as they are in point in this case, were that said *Law &
Conoon* executed said bond in the sum of 75,000 dollars, and
delivered the same to said *Fowler*, under the express under-
standing and agreement, that before said bond should be
complete, or delivered to the government, or to or for its use,
it should be executed also by one *Oliver Charlick;* that it was
not so executed by said *Charlick*, and was, without their con-
sent, transmitted by said *Fowler* to the appropriate depart-
ment at *Washington;* that upon inspection of the original
bond, it appeared that on the day of the date of said bond,
one *Henry Hilton* signed it as a subscribing witness, and, in
his capacity of Judge of the *New York* Common Pleas and
ex-officio justice of the peace, administered an oath to each
of said sureties, which was indorsed in print upon the back
of said bond, and subscribed by each of them, in which they
each depose and say: "he has executed the within bond, that
his place of residence is," &c., &c.   It was urged that this
amounted to an acknowledgement, &c., of said bond.   The
Judge says: "I think no higher legal effect is acquired for
the bond by that method of verifying its execution than sat-
isfactory oral evidence of the signature of the parties would
be.   * * *   Nor does it in any way preclude the proof that it
was executed conditionally."   He further says that "a vital
constituent to a bond is the delivery of it from the obligor to
the use of the obligee.   It remains inchoate and inoperative
until that act is completed.   * * * *   A sealed obligation
never takes existence as a deed or specialty until a delivery
be made of it by the obligor, or the terms upon which its ab-
solute delivery may be suspended have been fulfilled.   These
may be regarded as elementary principles of the common

law, determining the requisites of deeds or sealed obligations, although in books of evidence the rules may be found subject to diversities of application. 1 Greenl. Ev. § 568, note; 3 Cow. & H. notes to Phil. Ev. pp. 1276, 1281, 1286, 1453. Yet I apprehend none of them depart from the main doctrine of the common law, and all concur in requiring clear proof that the grantor or obligor has absolutely parted with the possession of the deed to the uses for which it was executed. The cases referred to show that a broad freedom of inquiry is involved in the consideration of the ingredients which constitute a complete delivery, amongst which a leading, if not the controlling one, is to ascertain and determine both the acts and motives of the parties engaged in the transaction, (*Jackson* v. *Dunlap*, 1 Johns Cases, 114; 13 Pick. 69, 75,) and when the intention to deliver is not made out, the execution of a deed will not give it vitality and operation."

As to those who signed without any false representations, promises or pledges having been made to them, we are clearly of the opinion that the bond is of no binding force. Each man had a right to rely upon the fact which appeared before him on the bond, namely, that he was entering into a contract in which certain other men, whose names were there signed, were jointly bound with him. When they are discharged, it increases his liability, and in fact it is no longer his contract, and the contract which he supposed he was making.

In the case at bar, the man whose name first appears as surety would be discharged under the ruling as to the non-performance of promises, &c., and consequently each one that followed would be released. This must be the case, unless it was the special duty of each person who signed it to inquire and know for himself the terms and conditions, if any, upon which each preceding name was placed to the instrument. Whatever may be the rule upon this point, as between co-

obligors, who sign a bond not negotiable, without the procurement of the obligee, it cannot be otherwise than as above indicated, where the signatures are procured by one who is acting as the agent of the obligee, or whose acts are afterwards adopted in that behalf, by said obligee. 2 Mumford, 33; 2 Bin. Rep. 195; 3 Randolph, 316; 3 Leigh's Rep. 590; *Barrington* v. *The Bank of Washington*, 14 Sergt. & Rawle, 405; 2 Pick. 24; 17 Mass. 591.

On petition for rehearing.

PERKINS, J.—This was a suit against *Michael Batzner*, and some twenty-five other persons as his sureties, on *Batzner's* official bond.

The sureties answered *non est factum*. Trial by the Court. Judgment for plaintiff.

The plaintiff contends to sustain the judgment:

1. That the sureties executed the bond sued on.

2. That if they did not, they are estopped by the facts in the case, to deny its execution. The bond is not commercial paper.

It is not clear that the plaintiff could give evidence of the estoppel, it not having been replied; but we shall waive this point. The point as to the technical execution of the bill of exceptions was not made on the original hearing, either by Court or counsel, and will not be noticed now.

The bond was not executed by all the defendants. As to one, it was a simple forgery; and as to others, against whom judgment was rendered, though the bond was signed by them, it was never delivered. It was not delivered by them to the obligee, nor, absolutely, to any one else for the obligee, but, conditionally, to the principal in the bond, to be delivered to the obligee, only in the event of its being first signed by certain other persons. It was delivered as an escrow, if it could be thus delivered to a co-obligor. See *Berry* v. *Anderson*, at

this term. As to some of the defendants, it must be admitted, no condition was imposed 'as to delivery, and as to some 'of them, the condition was not expressed with sufficient certainty to clothe it with the character of a contract. The question which we propose briefly to discuss is, were those defendants who signed the bond and delivered it conditionally to the principal in it, estopped to dispute its validity as to themselves, it having been delivered by the principal to the obligee, in breach of the condition?

It seems to be settled that an estoppel does not exist in such cases, at all events, where there are circumstances, in the given case, calculated to put the obligee on inquiry, or that may operate as notice of the imperfect condition of the instrument; for, in such case, the obligee does not stand as an innocent party; his own negligence is the proximate cause of the injury he sustains. *Passumsic Bank* v. *Goff, et al.,* 31 Vermont, 315; *Swann* v. *The North British Australian Company, in the Exchequer Chamber, May,* 1863; 10 Jurist, (N. S.) p. 102; *The York County Ins. Co.* v. *Brooks,* and note, Am. L. Reg. vol. 12, p. 399; *Berry* v. *Anderson,* at this term. The estoppel will prevail, if at all, only as to an innocent party— a party ordinarily diligent.

The inquiry arises, then, was there negligence in this case, on the part of the obligee, or those acting for the obligee, in accepting the bond? Our code provides that, a person elected county treasurer, "shall, before entering upon the duties of his office, execute his official bond, with at least four freehold sureties, in a penalty of not less than double the amount of money which may come into his hands at any time during his term, by virtue of his office, to the acceptance of the county commissioners." 1 G. & H., p. 640.

The code further provides, in an act on p. 160, 1 G. & H., that if it is discovered, after an officer enters upon his duties, that his bond is insufficient; or if it shall become so by reason

of the removal, &c.; of any of his sureties, the principal may be summoned before the Judge of Common Pleas to improve the old or execute a new bond.

The 14th section of this act, p. 165, reads thus:

"Any officer required to execute a bond, as provided herein, in consequence of the insufficiency of the sureties, may procure other sureties, *to sign the old bond*, at the time set for hearing such petition, and if such judge shall deem such new sureties sufficient, no new bond shall be required, but such old bond, with the names of the new sureties subscribed thereto, shall be directed to be filed with the proper keeper of such bond; and such new sureties, shall be liable for all the official acts of such officer, from the original date of the execution of such bond; and such bond thus signed by such additional sureties, shall be valid against the principal, the original and new sureties, and all such sureties shall be jointly and severally liable, for the official acts of such principal, from the date of the original execution of such bond."

These sections are public law, and those signing the bond in the case at bar, may be taken to have acted with a view to them.

Now, what do these sections import? Certainly that there is to be a sort of judicial investigation and approval of official bonds. Take the first section quoted. It is made the legal duty of the commissioners—

1. To fix the penalty of the bond, for it must be not less than double the amount of money, &c. The commissioners, then, must ascertain the probable amount of money, &c., and must then fix the penalty.

2. They must ascertain that there are not less than four freeholders among the sureties on the bond, and to do this, they should properly examine the persons themselves, because property is constantly changing hands.

Pepper *v.* The State ex rel. Harvey.

3. They must determine, that the bond has been executed by those whose names appear to it.

4. They must decide as to the amount of property represented by the bond to satisfy themselves of its sufficiency. All these facts the public interest, as well as the law, requires that the commissioners should be satisfied about. Now, the passing upon these points necessarily involves a full investigation of the facts connected with the execution of the bond. Such an examination, the commissioners will be negligent if they do not make. Such an examination, those signing the bond in the case at bar, had a right to expect would be made, and the commissioners must be chargeable with knowledge of the fact. And public policy, as well as justice to all parties, requires that the decisions of Courts should be such as will tend to induce commissioners to discharge this statutory duty. It may occasion loss in a few instances of existing bonds, on making the first decision, but the loss will be the fault of the commissioners not of the law or Courts, and future losses will be prevented.

It would seem that the natural way of complying with the statute quoted, by commissioners, in approving bonds, would be to first fix the amount of the penalty; then approve, on investigation, a number of persons as sureties; then let the bond be drawn up in that penalty with the approved names inserted in the body of the bond, &c.; and, afterwards, when the bond should be presented, satisfy themselves of the genuineness of signatures, &c. This is the mode in which Courts approve administration-bonds, appeal-bonds, &c. There are then fixed rules of law to determine the binding obligation of the instruments. In this case, no such course was taken. The principal got up a bond according to his notion, not upon the approval of the commissioners, and went about soliciting names to it, not of those whom the commissioners had accepted, not freeholders or non-freeholders, and with

nothing to guide the signers as to what would be the ulti-mate penalty, or who, or how many would be co-obligors. In such a state of facts what could signers do but make their own terms and conditions, knowing that, by law, all must be investigated, and might be changed on a hearing before the commissioners? That hearing and investigation it was the duty of the commissioners to institute, as they were bound to know. It was not instituted then, and, hence, may be now as to execution by each surety, and the consequence is, the county may suffer. The case of *Bibb* v. *Reid & Hoyt*, 3 Ala. p. 88, is directly in point, and, after much reflection, we are prepared to say, is, in our judgment, good law. We do not say that the same rule that applies to bonds taken pursuant to a statute, would apply in private transactions.

*Per Curiam.*—The judgment is reversed, with costs. Cause remanded.

*L. Barbour, J. D. Howland,* and *Hanna & Quick,* for the appellants.

*Geo. Holland* and *C. C. Binkley,* for the appellees.