# JOHN B. SMITH

*v.*

## THE BOARD OF SUPERVISORS OF PEORIA COUNTY.

1. BOND—*its execution—surety.* Where a person signed an official bond as a surety, and it was agreed between him and the principal in the bond that it should not be delivered to the obligee until another person, who was named as a surety, should sign the bond, but it was delivered without obtaining his signature: *Held*, that when the surety thus signed and delivered it to the principal, having intended to execute an operative bond, the obligee has the right to presume, in the absence of notice, that the surety had conferred full general authority to deliver the bond. Such an agent may bind his principal to the extent of his apparent authority.

2. AGENT—*of his authority.* A special agent's authority is that which is given by the terms of his appointment, or that with which he is apparently clothed by the character in which he is held out to the world, although not strictly within his commission, and whatever is done under an authority thus manifested, is within the authority, and the principal is bound for that reason. He is equally bound by the authority which he

actually gives, and by that which by his own acts he appears to give. The principal is responsible for the appearance of authority.

3. When one of two innocent persons must suffer by the act of a third person, he who has enabled such person to occasion the loss, must sustain it.

4. NEGLIGENCE. In such a case, it is not negligence in the obligee to fail to go to the surety and make inquiry whether there are any secret agreements between them not complied with. The surety had reposed confidence in his principal, and the obligee was not required to suspect that the principal was acting fraudulently. The surety, in such a case, runs the risk of the fraud of the principal whom he has intrusted with the delivery of the bond. It is his duty, under such circumstances, to see that the authority he has delegated is not abused, and it is not just or reasonable to permit him to take advantage of its abuse.

5. BOND—*its execution—notice of escrow.* Where such a bond is executed and delivered as an *escrow,* and the condition is not performed, that fact can be shown in defense, or where it is agreed by the principal and surety that the bond shall not take effect until a particular person also signs as surety, and the obligee has notice of the agreement, the fact that such person did not sign as a surety, may be shown in defense. And it is error for the court to refuse to permit the defendant to make proof of such facts, under the plea of *non est factum.*

6. SURETY ON TREASURER'S BOND—*liability of.* Where a county, under legislative authority, levies a tax to build a jail and an alms house, and issues bonds to be sold to raise money for such purpose, and the tax is collected, and the bonds placed in the hands of the treasurer and sold, and the money from both sources comes to the hands of the treasurer, his sureties are liable on their bond for any delinquency in failing to pay out the money according to law. And where county orders, drawing interest, are issued and placed in the hands of the county treasurer, to be sold, and the proceeds applied in redeeming other county orders, and they are sold by the treasurer, the money has been legally raised, and is in his hands as treasurer, and his sureties are liable for its misapplication.

7. SURETY—*on official bond—increased liability.* Where, after a county treasurer has been elected and given bond, the county authorities, under laws existing at the time, and a special act of the general assembly subsequently passed, authorizing the levy of a tax and the erection of an alms house, proceeded to levy the tax and to construct such a building, such action did not impose such additional liability as would release the sureties on the treasurer's bond. They will be presumed to have become sureties, knowing that such acts could and might be done during the official term of the treasurer. Such sureties are liable for the faithful performance of all duties of such an officer, whether imposed by laws enacted previous or

subsequent to the execution of the bond, only so that it comes within the scope of his official duty.

8. PAROL EVIDENCE—*settlements—balances and general results.* In such an action, where books and papers given in evidence are voluminous, it is not error to permit a witness, who has made computations therefrom, to testify to balances and the results of such computations, and to settlements made by the treasurer and the board of supervisors, but it is error to permit him to testify to a report of the finance committee made in the absence of the treasurer, and in which he had not participated, and to which he had not assented.

APPEAL from the Circuit Court of Woodford county; the Hon. S. L. RICHMOND, Judge, presiding.

Mr. JULIUS S. STARR and Mr. S. D. PUTERBAUGH, for the appellants.

Mr. H. GROVE, and Messrs. JOHNSON & HOPKINS, for the appellees.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

This was an action of debt, brought by the board of supervisors of Peoria county, against John B. Smith as one of the sureties on the official bond of Thomas A. Shaver, late county treasurer of Peoria county, to recover for an alleged defalcation of said treasurer.

The bond bears date December 18, 1867, and is joint and several; the name of Richard S. Cox is inserted in the body of it, as one of the sureties, but it is not executed by him. Shaver continued in office, exercising its duties, until November, 1869.

The non-execution of the bond by Cox, is made the first ground of defense.

The 15th, 25th, 26th, and 27th pleas, set up that the bond was signed by the defendant, on condition that it should also be executed by Cox as a co-surety, before the same should be delivered; that Cox failed to execute the bond; that in violation of said condition, the bond was delivered to the plaintiff without the knowledge or consent of the defendant.

The 27th plea varies from the others, in having the additional averment, that the other co-sureties signed the bond on the same condition.

The 15th and 26th pleas aver, that the plaintiff had notice of the facts stated in them, at the time of receiving the bond.

The 3d plea sets up the delivery of the bond to John D. McClure, county clerk, as an *escrow*, to be delivered to the plaintiff only in the event of the above condition being complied with.

Demurrers were sustained to all these pleas, and the first point made is, upon this ruling of the court.

We will first notice the 25th and 27th pleas, which do not contain the averment of notice on the part of the plaintiff of the alleged arrangement therein set forth.

A question is raised upon the phraseology of these pleas, whether it imports that the defendant signed the instrument on the condition, or only on the promise of Shaver, and on the faith that it should not be delivered to the obligee until signed by Cox, in which respect some authorities make the distinction, that in the former case the defense is good, but not in the latter. But we will allow the pleas the full benefit in this respect, and regard them as setting up a conditional delivery to Shaver. In considering the pleas, we shall leave out of view the fact of Cox's name appearing in the body of the bond, as whether it be a circumstance which should have put the obligee upon inquiry, and from which notice might be implied, is a question of evidence only, and not to be considered on a question of pleading. It is but evidence tending to show notice, not conclusive evidence of notice. The pleas should aver notice, not evidence of notice.

The question, then, which we shall consider as the one arising under these pleas is, whether, when a surety who signs and seals a bond, and then delivers it to the principal obligor, upon the condition that it shall not be delivered to the obligee until it has been also signed by another co-surety, and the principal delivers it to the obligee in disregard of the condition, the

obligee having no notice of the condition, and there being no circumstances which should put him on inquiry, does the instrument become operative as the deed of the surety ?

This is a controverted question, upon which there is a conflict of authority. In recent decisions, it has undergone full discussion, and the authorities have been fully reviewed.

We shall not undertake to go over the ground, nor to do more than state generally the views and conclusion which we have been led to adopt, and notice to some extent the authorities sustaining them.

There is a line of authorities, among which may be found *The People* v. *Bostwick et al.* 32 N. Y. 445, and *Bibb* v. *Reed,* 3 Ala. 38, which deny the legal liability of a party signing an instrument under the above circumstances; and the legal ground upon which the decisions are rested, is this : that delivery to the person in whose favor it is made, is a circumstance essential to the completion of every deed ; that there is no delivery by the signer himself, and that the person in whose hands he intrusted it, to deliver only in the event of a certain condition being performed, is a special agent for that purpose ; and that the law is, if a special agent exceeds the authority conferred on him, the principal is not bound by his acts, it being the duty of the party, dealing with such a one, to ascertain the extent of his authority ; and that hence, the delivery of the instrument by the agent to the obligee, before the performance of the condition, would be an unauthorized act and a nullity, and the instrument would not become the deed of the party who had affixed his name and seal to it ; that the case depends upon the actual authority committed to him who was intrusted with the deed.

But this rule of law, as to a special agent, is attended with the qualification, that the agent is not held out as possessing a more enlarged authority, Story on Agency, sec. 126 and note; and is not this just that case?

The several persons whose names and seals were attached to the bond, were connected together in effecting a common

object, the giving of an operative instrument to the party named in it as obligee ; the act of one, in furtherance of it, may reasonably be taken as the act of all ; they sign and seal the instrument for the purpose of its going into the hands of the obligee as their deed ; the actual possession of it must be held by some one of them, and it must be actually delivered by the hands of some one of them ; the principal obligor, naturally the chief actor, presents it for the acceptance of the obligee ; the instrument is in the regular channel of delivery ; the appearance which the signers of it have created by their acts, is that of an absolute authority in the principal obligor to deliver the instrument as and for what it purports on its face to be, the deed of those who have affixed their names and seals to it.

And though there was no actual authority to deliver the deed at the time, before the performance of the condition, an implied authority to deliver it, we think, should be held to have been given by the acts of the party signing.

In the case of *Pickering* v. *Busk*, 15 East, 38, Lord ELLEN-BOROUGH, C. J., holds the following language : "I can not subscribe to the doctrine, that a broker's engagements are necessarily, and in all cases, limited to his actual authority, the validity of which is afterwards to be tried by the fact. It is clear, that he may bind his principal within the limits of the authority with which he has been apparently clothed by the principal, in respect to the subject matter."

Mr. Parsons, in his treatise on Contracts, states the rule thus : "An agent's authority is that which is given by the terms of his appointment, notwithstanding secret instructions ; or, that with which he is clothed by the character in which he is held out to the world, although not strictly within his commission. Whatever is done under an authority thus manifested, is actually within the authority, and the principal is bound for that reason ; for he is bound equally by the authority which he actually gives, and by that which, by his own acts, he appears to give. * * The appearance of the authority

27—59TH ILL.

is one thing, and for that the principal is responsible." 1 Pars. on Cont. 44.

In behalf of the rule which holds to the liability of the surety in such a case, the principle laid down in the case of *Lickbarrow* v. *Mason*, 2 T. R. 70, is invoked, that whenever one of two innocent persons must suffer by the act of a third person, he who has enabled such person to occasion the loss, must sustain it.

But, in *The People* v. *Bostwick et al. supra*, the just application of that principle to such a case as the present, is denied, on the ground that the one who claims the benefit of it, is himself guilty of negligence. But holding, as we do, a view different from the one in that case, as to the necessity of an actual authority in order to bind the surety by the delivery, we fail equally to perceive that there was negligence on the part of the obligee, in not ascertaining the extent of the authority of Shaver, the principal obligor.

We do not consider, that the obligees should have looked upon him as being about to practice a fraud upon his co-obligor, and that it was their duty to go to the surety and ascertain whether the principal was about to defraud him by his act. There was nothing, surely, in the relation of the obligors, to awaken a suspicion that the one meditated a wrong toward the other. Being so associated as they were, implied means of knowledge as to trustworthiness; the surety had reposed trust in his co-obligor, why should the obligee distrust him?

There is no actual negligence imputable to the obligee, and there is none other than the technical neglect of not ascertaining the extent of the actual authority of a special agent. And as we hold, the duty of so doing did not exist, in this case the obligee is not chargeable with even such neglect.

We regard the case as one where the surety must run the risk of the fraud of his own agent. We deem it the duty of the signer of an instrument, under such circumstances, to see to it that the authority he has so delegated is not abused, and

that it is not just nor reasonable to allow him to take advantage of its abuse to defeat his obligation.

The following are cases affirming such view: *Deardorf* v. *Foreman*, 24 Ind. 481; *The State* v. *McCarty*, 31 id. 76; *Millett* v. *Parker*, 2 Metc. (Ky.) 608; *Smith* v. *Moberly*, 10 B. Mon. 266; *State* v. *Peck*, 53 Maine, 284; and see also, as bearing upon the same principle, *Bartlett et al.* v. *The Board of Education*, *ante*, p. 364.

In *Deardorf* v. *Foreman*, *supra*, in pronouncing upon a similar question, the court say: "The surety places the instrument, perfect upon its face, in the hands of the proper person to pass it to the obligee, and the law justly holds that the apparent authority with which the surety has clothed him, shall be regarded as the real authority; and as the condition imposed upon the delivery was unknown to the obligee, therefore the benefit of such condition shall not avail the surety." This case, as well as *The State* v. *McCarty*, *supra*, are especially noteworthy, as they discard the contrary rule which had previously been laid down by the same court in the case of *Pepper* v. *State*, 22 Ind. 399, a well considered case, in which the authorities were extensively reviewed.

In the case of *Smith* v. *Moberly*, *supra*, this language is used by the court: "But a delivery of a writing of this character, under such circumstances, to the principal, does not have the effect of characterizing it as a mere *escrow*, but on the contrary, the principal should be considered as the agent of the surety, and empowered by him to pass the writing to the person to whom it may be made payable, and his delivery as being sufficient to make it effectual, unless the payee had notice of the special terms upon which it was signed. The implied discretionary authority to use the note, arising out of its possession by the principal, uncontradicted by its terms or any thing apparent on its face, can not be restricted by any agreement between the payors themselves, of which the payee had no notice."

The supreme court of Vermont have also held, that where a note, payable to a bank, was signed by a principal and one surety, with an agreement on the part of the principal, with such surety, that he would procure another surety, which was not done before he procured the note to be discounted, it will constitute no defense, unless the officers of the bank were cognizant of such agreement. *Passumpsic Bank* v. *Goss*, 31 Verm. 315. This seems opposed to the decision of the same court, in the case of *Fletcher* v. *Austin*, 11 Verm. 447, laying down the contrary rule in the case of a bond, and generally cited among the class of opposing cases. But the court, in the latter case of *Passumpsic Bank* v. *Goss*, place their seeming departure from the former one, on the ground that, in the former case, the instrument was incomplete upon its face, which was a circumstance that affected the obligee with implied notice of the condition which the surety had imposed upon the delivery of the bond.

The rule denying the validity of the defense set up in these pleas, we find sustained by the weight of respectable, if not prevailing, authority. We regard it as the just one; and the contrary rule, allowing makers of a joint instrument to defeat their obligation by setting up violated secret arrangements, made amongst themselves, and unknown to the obligee, appears to us an unsafe one, too. It would seem like opening a convenient way whereby, in very many cases which might be found to arise, those so disposed might be enabled to escape from the performance of their just engagements.

Reference has been had, on the argument, to the evidence on the trial, as bearing upon the merits of the pleas, which, of course, can not be looked to, in determining the question of the sufficiency of the pleas. It must be decided upon the inspection of them alone.

It follows, that the demurrers were properly sustained to the 25th and 27th pleas.

The 3d plea is one in regular form, of the delivery of the instrument to a third person as an *escrow*, with the condition

unperformed. The 15th and 26th pleas aver notice. We think these last named three pleas contain good matter of defense. Nevertheless, the special demurrers to them were properly sustained, under the ruling of this court in the case of *The Governor etc.* v. *Lagow et al.* 43 Ill. 135, as the plea of *non est factum* was in, under which the facts alleged in these pleas might have been given in evidence.

Upon the trial, the defendant offered to give in evidence, by certain witnesses, all the facts set up in the pleas to which demurrers had been sustained, and the evidence was rejected by the court. In justification of this ruling, it is said, such offer of evidence was too general and sweeping. It might be so, ordinarily, but not, we think, in view of what had transpired in the case. The court was aware of the contents of the pleas, they having been under its examination in deciding upon the demurrers to them; and as they had been held on demurrer not to constitute a defense, there was reason to believe it would be so held upon the introduction of them in evidence ; and we regard the offer as but a matter of form, in order to save the rights of the defendant under the decision of this court in *Curtiss* v. *Martin*, 20 Ill. 558, that where a demurrer is sustained to a special plea, if the facts alleged in it could be given in evidence under the general issue pleaded, the presumption would be, that they had been admitted under the general issue, unless the bill of exceptions showed that the evidence was offered on the trial and rejected by the court.

It does not appear that the demurrers were sustained upon the ground that their subject matter might be given in evidence under the plea of *non est factum*, and we might infer the contrary, from the offer of the evidence being in such a form.

We think it just ground of complaint, as error, that the defendant, by the ruling of the court, was deprived of the opportunity of asserting the defense set up in these three pleas.

The second branch of the defense in this case is, that the only moneys in the hands of Shaver, the principal, which he

failed to account for and pay over, were funds of such a character that his sureties are not liable for his failure to pay them over.

There are three classes of these funds: the proceeds of the sale of certain bonds of the county of Peoria, issued to raise money for building an alms house, and taxes levied for the same purpose.

The proceeds of certain bonds of said county, issued for the purpose of raising money to build a sheriff's house and jail.

The proceeds of certain interest bearing orders, issued by the board of supervisors of said county, for the purpose of raising money to take up county orders.

The condition of the county treasurer's bond was, that he should "faithfully execute the duties of his office, and pay, according to law, all moneys which shall come to his hands as such treasurer," etc.

The township organization act of February 20, 1861, makes it the duty of the county treasurer "to receive all moneys belonging to the county, from *whatever source they may be derived*, * * and to pay and apply such moneys in the manner required by law." Sess. Laws, 1861, p. 239, sec. 4. Section 3, p. 235, of the same act, gives counties the capacity "to make such contracts, and purchase and hold such personal property as may be necessary to the exercise of their corporate or administrative powers."

By the 17th section of the act entitled "Paupers," Gross' Stat. 474, it is enacted that "The county (commissioners') court in each county, is hereby authorized (whenever it shall see fit so to do) to establish a poor house;" and sec. 19, ibid. empowers such court, from time to time, if it shall see fit, to levy and collect a tax not exceeding one-fourth of one per cent on the taxable property of the county, for the purchase of not exceeding six hundred and forty acres of land, and the erection and furnishing of buildings suitable to a poor house.

The board of supervisors are the legal successors to the county commissioners' court. *Green* v. *Wardwell*, 17 Ill. 281.

Section 14, p. 238, of the township organization act, provides, "It shall be the duty of the several boards of supervisors, as often as it shall be necessary, to build court houses and jails, or cause the same to be repaired, in their respective counties, at the expense of such counties."

In addition to these general provisions of law, all existing at the time this bond was entered into, there was also a special act passed February 9, 1857, authorizing the board of supervisors of Peoria county to build a court house and jail, and to issue bonds of the county to the amount of $100,000 to pay for the erection of the same.

On the 26th day of March, 1869, which was after the execution of the bond, the legislature passed an act authorizing the board of supervisors of Peoria county to build an alms house, and to issue bonds of the county to the amount of $60,-000 to pay for the erection of the same.

The pleas setting up the second branch of the defense, as respects the said bonds and interest bearing orders, aver that they were placed in the hands of Shaver, as agent, to negotiate for the county, and that the money derived from their sale was no part of the funds required to be accounted for by the county treasurer, for which the defendant was liable; but the pleas fail to negative the receipt of the money as county treasurer, as is averred in the declaration, and in that respect are bad, and it is enough upon that point to refer to the case of *Green et al.* v. *Wardwell*, 17 Ill. 279, being an action upon the official bond of a justice of the peace for a failure to pay over money collected in his official capacity, where it was similarly averred in a plea, that the notes and accounts there in question were not left with the officer as justice of the peace; and the court, in holding the plea bad, say, "It is of no moment in what capacity he received the evidences of the debts. The question is, in what capacity did he receive the money? The declaration charges him with receiving the money as a justice of the peace, and this is not denied by the plea." The question does not respect a liability of the treasurer for these bonds

or orders, but for the money proceeds of them, which came into his hands from their sale.

As to the taxation for the purpose of building an alms house being without authority of law, there seems to be a special warrant for it in the provision cited, authorizing the levy of a tax not exceeding one-fourth of one per cent, for the purchase of land and the building of a poor house.

It is urged, that the money arising from the interest bearing orders, was money borrowed without authority, upon county orders bearing ten per cent interest. These orders seem to have been issued and disposed of, to take up other county orders. The transaction, in substance, was no more than taking up one form of indebtedness by issuing another in the place of it. In *City of Galena* v. *Corwith*, 48 Ill. 424, it was held, that a municipal corporation has the right to pay its debts, or provide for their payment, to fund them if that be deemed the best policy, and issue the necessary evidences thereof.

Ample power to issue the bonds to pay for the building of a sheriff's house and jail, is found in the special act for that purpose, of February 9, 1857.

A point is made here, that the authority was to issue bonds for the purpose of building a *jail*, and not a *sheriff's house and jail*. We will not intend that, as used in this connection, the "sheriff's house" was to be a separate building, disconnected from the jail, for the residence, merely, of the sheriff, but we shall take the language of the pleader most strongly against him, and hold "sheriff's house and jail" to mean but a single structure, for the safe keeping of prisoners, and the lodgings of the sheriff or jailor having them in charge.

It is insisted, that subsequent to the execution of the bond, the liability and risks of the defendant, as such surety, were materially increased by the plaintiff, and also by an act of the legislature, without the knowledge or consent of the defendant, whereby he became discharged.

We see nothing in the case to lend countenance to any such claim, except the special act of the legislature, of March 26

1869, authorizing the plaintiff to issue the bonds for the erection of an alms house. As respects the proceeds of these bonds, it may be said a risk and liability has been cast upon the defendant which could not have arisen under any law in existence at the date of the bond. But the building of an alms house was a necessary county purpose. At the date of the bond, it was by law made the duty of the board of supervisors to build one, and the legal intendment must be, that it was in the contemplation of the surety when he executed the bond, that such an alms house might be built during his principal's term of office, and that the necessary means therefor might come into his hands, and that he assumed his obligation in reference to such a contingency. Upon this subject, as to affecting the liability of the surety of an officer by imposing additional duties upon him by subsequent legislation, the well settled principle is thus declared in the case of *Governor of Illinois* v. *Ridgway*, 12 Ill. 14:

"The sureties of an officer, upon his official bond, are liable for the faithful performance of all duties imposed upon such officer, whether by laws enacted previous or subsequent to the execution of the bond, which properly belong to, and come within the scope of the particular office, and not for those which have no connection with it, and can not be presumed to have entered into the contemplation of the parties at the time the bond was executed."

See, also, *Compher* v. *The People*, 12 Ill. 290; *The People* v. *Leet et al.* 13 id. 268; *The People* v. *Villas*, 36 N. Y. 459.

We hold it no ground of legal objection, that a portion of these moneys came into the hands of the treasurer in consequence of this subsequent legislation.

We consider that all these funds belonged to the county, and came into the hands of the county treasurer for necessary county purposes; that they were derived from no extraordinary source, but by means of the necessary and proper exercise of the administrative powers of the county through its board of supervisors; it was, by law, made the duty of the

county treasurer to receive all moneys belonging to the county, from whatever source they might be derived, and liability, in respect to these moneys, was within the true scope of the bond.

The question upon this liability was presented in the forms of pleas, objections to evidence, and instructions, and it is sufficiently disposed of in all these respects, by saying, that the demurrers to all the pleas setting up this branch of the defense, were properly sustained.

It is objected, that the summary statements of the various accounts made by the witness West, the deputy county clerk, were improperly admitted in evidence.

The original books kept by Shaver himself, in his capacity as treasurer, and the books of the county court, his settlements with the board of supervisors, and all the original books and papers from which these statements were made, were given in evidence. The books and accounts were voluminous, and so far as the statements were the results of mere computations from the books and papers, having been verified by the oath of the witness, we think they were properly admitted in evidence. They were of great use to the court and jury in determining, with greater dispatch and convenience, the true condition of the books and accounts ; in fact, it would have been almost impracticable to have done so without such aid.

Mr. Phillips, in his work on Evidence, with Cowan & Hill's notes, 5th Am. Edit. vol. 1, p. 491, under the head of "Inquiry as to general mode of dealing," lays it down thus: "Inquiry has been allowed in some cases, as to a general mode of dealing, or as to the general result of an examination of accounts, and such other matters where the evidence is the result of voluminous facts, or of the inspection of many books and papers, the examination of which could not conveniently take place in court." And on the next page it is stated, that "a witness may give evidence of a general balance of accounts."

But so far as any statement was made up from the reports of the finance committee, without any evidence of Shaver's assent to their correctness, it was incompetent evidence.

One such report was made after his term of office had expired. The repeated use of the word "defalcation," too, in the statement, was objectionable, as tending to the prejudice of the defendant.

For errors which have been indicated, the judgment is reversed and the cause remanded.

*Judgment reversed.*