CHARLES COMSTOCK *et al.*

*v.*

DAVID A. GAGE, for use, etc.

1. DELIVERY OF BOND — *possession by the obligee, and acquiescence therein.* The possession of a bond by the obligee is *prima facie* evidence of its delivery, and the acquiescence on the part of the obligors in its retention by the obligee, without taking any steps to procure its return, affords strong evidence of an unconditional delivery, or, if there was a condition to the delivery, as, that another person was to sign the bond, that it was waived, or that the condition was only for the interest of the obligee and to satisfy him, and not one which was considered as of importance to the obligors, to be performed before they were willing the bond should be delivered and have effect.

2. SURETYSHIP—*condition that another was to sign as co-surety—of evidence in respect thereto.* In a suit upon a bond executed by several, some of whom were sureties only, the latter offered to show on the trial, that, at the time they signed the bond, they did so upon the condition explained to one of the co-obligors, who had the custody of the bond at the time, that it should not be delivered to the obligee until it was signed by another, but whose name did not appear upon the bond. There was no offer to show that this understanding between the defendants was made known to the obligee. The court refused to admit the evidence, and it was held there was no error in doing so.

3. It is no defence for a surety in a bond that he signed it on condition that it should also be executed by another person as a co-surety before its delivery, and that in violation of such condition the bond was delivered to the obligee without having been executed by such other person, it not appearing that the obligee had notice of the condition.

4. SAME—*failure to communicate facts—effect upon liability of surety.* In order that a failure to communicate a fact to a surety, in respect to the subject matter of the proposed contract, should have the effect of a fraud upon him, and vitiate the contract, it must be a fact which necessarily must have the effect of increasing the responsibility of the surety, or operating to the prejudice of his interest.

5. SAME—*in respect to deposits in bank by a city treasurer—such deposits being pledged as collateral security for the treasurer's private indebtedness.* A bond given to a city treasurer recited that the obligee, as such treasurer, had deposited money in a certain bank, and was about or might deposit other sums of money, such moneys being the property of the city, and was conditioned that the bank should promptly, upon demand or presentation, pay the checks or drafts drawn by the obligee, as such treasurer. In a suit upon the bond the sureties alleged, that, by an arrangement between the bank and the depositor, the moneys deposited were to remain as security for the depositor's private indebtedness to the bank, so that his power to withdraw the money depended upon his ability to pay that indebtedness, and the fact of such arrangement not having been communicated to the sureties, they were not bound. But it was *held*, as the depositor had no right to pledge the public money as a security for his private indebtedness, and the bank ought to have known that, such an arrangement would have been no obstacle to his drawing the money; and the omission to inform the sureties of the existence of such an arrangement did not operate to relieve them from their obligation.

6. SAME—*as to deposits drawing interest—and herein, of the scope of the bond.* The fact that the deposits mentioned were, by an agreement between the bank and the depositor, to draw interest, and the sureties were not informed of such agreement, would not affect the liability of the sureties. Such deposits frequently are by agreement made to bear interest. The terms of the bond were broad enough to include deposits of that class, and if the interest feature were an objection with the sureties it was their business to have found out how it was in this respect when they executed the bond.

7. SAME—*illegality of contract, as affecting liability of sureties.* Where a bank has received money belonging to a city on deposit, through the city treasurer, even though the deposit was obtained through an illegal scheme, and wrongfully on the part of the bank, still it would not be illegal for the bank to pay back the money to the city, and there would arise an implied promise to do so. An express engagement, then, by a third person that the bank should perform such implied promise, would be binding.

8. CONTRACT—*embezzlement by city treasurer—"loan" of public money by deposit in bank.* The crime of embezzlement, as defined in the charter of the city of Chicago, is the conversion by the treasurer of the city to his own use in any way whatever, or the use by way of investment or loan, with or without interest, (unless differently directed by the common council) of any portion of the

city money entrusted to him. It is *held,* the word "loan," as employed in the statute, or the use of money by way of loan, would not embrace the case of a deposit of money of the city in a bank for safe keeping. So, in a suit upon a bond given by a bank for the return to the city treasurer of money deposited by the treasurer, on the allegation the bond was void as given to secure a contract forbidden by the statute, it was *held* the matter of making the deposit did not constitute the offence of embezzlement.

9. SAME—*deposit of public money without authority.* And even if the city treasurer should deposit the money of the city in a bank without proper authority from the city council, the council having the control of that subject, still the absence of such authority would not relieve the bank of its duty to return the money when called for, or constitute a defence to a bond executed to secure its return.

10. SAME—*fraudulent collusion, or neglect of duty of officer, as affecting validity of contract to pay back public money.* And any irregularity or failure in the discharge of his duty by a public officer in respect of a deposit of public funds in a bank, or any fraudulent or illegal collusion with the bank, could not render illegal and incapable of being enforced a bond given by the bank to secure the safe return of the money to the public treasury.

11. CONSIDERATION—*for bond to repay deposits.* The deposit of money with a bank, is an ample consideration for a bond given by the bank, with sureties, to return the money so deposited when called for.

12. TENDER—*in city orders.* In a suit by a city treasurer upon a bond given by a bank to secure the return to the city treasury of moneys deposited, evidence of an offer by the bank to deliver orders of the city on its treasurer, and money equal to the remaining deposit, is properly excluded, such orders not being a legal tender.

13. BANKRUPTCY—*discharge of surety.* A claim against a surety who is declared a bankrupt may be proved against his estate, at any time after his liability becomes fixed, and before the final dividend is declared; and his discharge will release him from any liability that might have been proved against his estate in bankruptcy.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

This was an action brought in the name of David A. Gage, for the use of the city of Chicago, upon a bond to said Gage in the penal sum of $500,000, signed by Ira Holmes, Charles Comstock, James Kelley, J. A. Holmes, W. A. Butters, and William M. Tilden, who were all directors, and Ira Holmes

also president, of the Manufacturers' National Bank of Chicago, and by one other person—Samuel J. Walker.

The date of the bond was January 9, 1872, and its condition as follows:

" The condition of this obligation is such, that whereas, the said David A. Gage, as treasurer of the city of Chicago, has, at the request of the above named obligors, or some of them, deposited with the Manufacturers' National Bank of Chicago certain moneys, the property of the city of Chicago, and is about or may deposit other sums of money, from time to time, as such treasurer, with said Manufacturers' National Bank of Chicago:

"Now, therefore, if the said Manufacturers' National Bank of Chicago shall promptly, upon demand or presentation, pay all checks or drafts which may be made by the said David A. Gage, as such treasurer, or by any of his authorized clerks or agents, and shall, at all times, render to said David A. Gage full, just and true statements of his account with said Manufacturers' National Bank of Chicago, whenever required to do so by said Gage, then this obligation is to be void, otherwise to remain in full force and virtue."

Gage was treasurer of the city of Chicago from December, 1869, to December, 1873,—two terms. He opened an account with the bank some time during the year 1871, upon the agreement that the bank should pay him four and one-half per cent interest upon his deposits. It did pay him at that rate up to September, 1873, when it closed business. At the time of the giving of the bond, Gage had $40,000 in the bank to his credit, as treasurer. The bank held about the same amount of his individual guarantees on paper, for which he afterwards gave his own notes. In December, 1872, Gage took up his own notes, giving in their place other securities, known as the Reed & Sherwin paper, amounting, substantially, to $40,000, —the first piece of the paper maturing in sixty or ninety days, and every six months thereafter until all was paid, $5000 matured.

Holmes testified, that at the time the bond was given there was an arrangement that Gage would leave the $40,000 on hand as long as the bank would carry the paper for Gage, and, also, that when the Reed & Sherwin paper was taken by the bank, Gage agreed that the deposit should remain and be an off-set, so that the bank should be no money out.

Gage testified, that he told Holmes that the city would probably be having money, and that if Holmes would give him a bond (which he did about that time or after that time), Gage would keep an account with him, and very likely the average account would be $40,000,—perhaps sometimes more and sometimes less; and when the Reed & Sherwin notes were discounted, he told Holmes he had no doubt there would be an average account there of $40,000. There might be more and there might be less. That this was substantially all the arrangement upon the subject of keeping the permanent deposits there. No further deposit than the $40,000, at the date of the bond, appears to have been made, and that sum remained on deposit, intact, until June 30, 1873, when $25,000 was drawn out by Gage, by check. At that time Gage was indebted to the bank as guarantor upon the Reed & Sherwin paper, which was taken by the bank in December, 1872. The Reed & Sherwin notes have all since been paid. The other $15,000 of the deposit was never paid. A proper check for that amount was presented to the bank about January 1, 1874, and the president of the bank declined to pay the money, saying that the bank had suspended, and the check would not be paid.

Section 31, chap. 5, of the charter of the city of Chicago, and the amendment thereto, in force at the date of this bond, provided, in substance, that the city treasurer should keep safely the city money, without loaning or using the same (unless differently directed by ordinance or resolution of the common council), and if he should convert to his own use, in any way whatever, or should use, by way of investment or loan, with or without interest (unless differently directed by

ordinance or resolution of the common council), any portion of the city money intrusted to him, every such act should be an embezzlement of the money so taken, converted, invested, used or loaned, and a felony ; and all persons advising or participating, or being a party, are punishable by six months' imprisonment in the penitentiary, and a fine equal to the amount of the money embezzled. Sec. 17 of the same act, as amended, provided, that the treasurer might be required to keep any and all money in his hands, belonging to the city, in such bank or banks, or other place or places of general deposit, or in such place or places of deposit, in the manner and upon the conditions, and upon such rate of interest, or otherwise, as the common council might, from time to time, direct. This section further requires him to keep the money separate from his own, and not to use the same, directly or indirectly. Sec. 19 provides, that in case any money belonging to the city shall be directed, by the common council, to be deposited in any bank, it shall be its duty, before the deposit, to cause such bond or other security to be given to the city as the common council may approve. (Act Feb. 13, 1863, and amendments of March 29, 1869.)

The jury found a verdict for $18,000 against the signers of the bond, except two, Ira Holmes and Butters, discharged in bankruptcy. A motion by the defendants for a new trial was overruled, and a judgment entered upon the verdict. Three of the defendants, Comstock, Kelley and Tilden, take this appeal.

Messrs. HURD & NICHOLSON, Messrs. McCAGG, CULVER & BUTLER, and Mr. GEO. F. COMSTOCK, for the appellants.

Messrs. MATTOCKS & MASON, and Messrs. MILLER & FROST, for the appellee.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

The first point made by the appellants is, that there was no delivery of the bond. The only two material witnesses upon

the trial were the defendant Ira Holmes, the president of the bank as well as a director, and Gage. William H. Adams was one of the directors of the bank, and the bond is signed by all the directors except Adams.

The testimony of Holmes is, that Gage required a bond to secure his deposit with the bank, and he, Holmes, said that he would give the names of all the directors of the bank and Samuel J. Walker, and Gage said that would be entirely satisfactory, and witness then got the signatures to the bond, and Gage got it from him under these circumstances :—that Gage came to him and asked for the bond, and witness stated to him that the bond was not complete and not ready for delivery to him,—that it lacked the signature of Adams; that Gage said he wanted to submit it to the finance committee, which was to meet that day ; that witness gave him the bond to show to the finance committee, and he was to hand it back to witness, and Adams was to sign it, and it was to be delivered afterwards ; that Gage did not bring it back, and witness never saw the bond afterwards until the trial, and never afterward had any conversation with Gage in regard to it.

Gage testifies that the proposal of Holmes was to give him a bond with all the directors upon it,—he does not recollect that Walker was to be upon it; that at the time he got the bond he thinks Holmes told him Adams' name was not on the bond, and witness told him the bond was satisfactory to him and does not remember of having said anything more about it at that or any other time, and then he took the bond ; that Walker was supposed to be worth $1,000,000 at that time. This is the testimony which is relied upon as proof of the non-delivery of the bond. The possession of the bond by the appellee was *prima facie* evidence of its delivery. The acquiescence in the retention of the bond by Gage without afterward speaking to him upon the subject, is quite strong evidence, either that there was an unconditional delivery to Gage, or that if there was such a condition attached to the taking of the bond by Gage as testified to by Holmes, it was waived,

or that it was one only for the interest of the obligee and to satisfy him, and not one which was considered as of importance to the signers of the bond to be performed before they were willing the bond should be delivered and have effect as their bond.

The question of the delivery was one of fact for the jury, and there is no sufficient reason for disturbing their finding under the evidence.

It is next urged, that the court below erred in refusing to allow the appellants to show the condition on which they signed the bond. They offered to show on the trial that at the time they signed the bond, they did so upon the condition explained to Holmes, who had the custody of the bond at the time, that it should not be delivered until it was signed by Adams.

The court refused to admit the evidence, and exception was taken. There was no offer to show that this understanding between the defendants was made known to Gage. This precise question was decided by this court in the case of *Smith* v. *Peoria County,* 59 Ill. 412, where it was held to be no defence for a surety in a bond, that he signed it on condition that it should also be executed by another person as a co-surety, before it should be delivered, and that in violation of such condition the bond was delivered to the obligee without having been executed by such other person, it not appearing that the obligee had notice of the condition. We are entirely satisfied with the correctness of that decision as founded on principles of sound policy and justice, and sustained by authority, and it must control and be held as decisive upon the present question. The court did not err in excluding the evidence. In support of the decision in *Smith* v. *Peoria County,* in addition to the authorities there cited, see *Dair* v. *United States,* 16 Wall. 1, *Butler* v. *United States,* 21 id. 272, *Russell* v. *Freer et al.* 56 N. Y. 67, and see *Stoner* v. *Millikin,* 85 Ill. 218.

Another and the most important ground of error insisted upon, arises out of the arrangement made between Gage and

the bank, as testified to by the witnesses Holmes and Gage, in respect to the deposit, and Gage's individual indebtedness. This is presented in a twofold aspect, as being a fraud upon the sureties, the makers of the bond, and as an illegal transaction. The question is raised upon instructions, and so is one of law, and not of fact upon the evidence.

In the bearing upon the sureties, the objection is, that material facts were concealed from them at the time of the execution of the bond; that the bond itself implies a different transaction from the real one; that this invalidates the contract of suretyship.

It is said the transaction here presented to the mind of the surety by the bond was the well known and customary one of depositing money in a bank where the customer is at liberty to draw out his money at such times and in such sums as he pleases, where neither party is under any special obligation to the other; while in fact, an entirely different state of things existed. That the sum nominally on deposit was really pledged to the bank to secure a debt of the depositor in a like amount, and his power to withdraw it depended upon his ability to pay that indebtedness. We do not see that this alleged arrangement that the deposit should remain as security for Gage's private indebtedness stood in the way of drawing out the money at pleasure. The money was the city's money, so known to the bank, and deposited as such. Gage had no right to pledge or in any way appropriate it for the security or payment of his individual indebtedness to the bank, which the latter must have, or ought to have known; and notwithstanding such alleged arrangement, Gage might have drawn his checks at any time upon the deposit, and if refused payment, the bank could at once have been made to refund to the city.

In order that failure to communicate a fact to a surety should have the effect of a fraud upon him and vitiate the contract, it must, we conceive, be a fact which necessarily must have the effect of increasing the responsibility of the surety,

or operating to the prejudice of his interest. The only way in which we can see how the arrangement alleged to have been had could have worked to the disadvantage of the sureties is, that it might have, as it probably did have the effect, to keep a continuous deposit on hand to the amount of the Gage indebtedness. But this was not the necessary effect.

The bond recognizes an existing deposit, and that there might be further deposits from time to time, and intimates no idea of any restriction in respect of amount. That deposit was $40,000 and so remained until the drawing out of the $25,000 June 30, 1873.

The testimony is that the amount of the city moneys on deposit in the different banks was large, $1,600,000, and that at the time the $25,000 was drawn, there were $400,000 or $500,-000 so on deposit. This shows the extent of the responsibility which the sureties must reasonably have contemplated, and that a constant deposit of as high an amount as $40,000 could not have been unexpected; so that the non-disclosure of an arrangement that that amount was to remain in constant deposit, may be regarded as of but little import to the signers of the bond. It is said the deposit drew four and a half per cent interest, that this was not on the usual terms of making deposits in banks, and that it was only such deposits, on the usual terms, that the bond contemplated. Such deposits frequently are by agreement made to bear interest   The terms of the bond are broad enough to include deposits of the latter class, and if the interest feature be an objection with the defendants it was their business to have found out how it was in this respect when they executed the bond. As one of the makers of the bond, Walker, was not a director of the bank, we have not relied upon the view presented on the other side, that this arrangement having been made with Holmes himself the president and one of the bank directors, and all the other makers except Walker being directors, the defendants had, or must be held to have had, full cognizance of the transaction. But this may not improperly perhaps be adverted to as a cir-

cumstance in repelling the charge of fraud upon the sureties. We do not think the appellants have any just ground of complaint of the non-communication to them of material facts in the respect alleged, at the time of the execution of the bond, as being a fraud upon them, and reason for not being held bound.

As respects the illegality insisted on, it is contended that the bond was to secure a contract forbidden by statute, and is therefore void. It is claimed that the transaction between Gage and the bank was the crime of embezzlement as defined by section 31, chap. 5 of the charter of the city of Chicago. The crime of embezzlement as there defined is, the conversion by the treasurer to his own use in any way whatever, or the use by way of investment or loan, with or without interest (unless differently directed by ordinance or resolution of the common council) of any portion of the city money entrusted to him. There was no conversion of the money by the treasurer to his own use, nor investment of it; but it is said there was a loan of it, and various authorities are cited to show that a general deposit of money in a bank is in effect a loan,—as, 2 Chit. Cont. 278; Morse on Banks and Banking, 25–6; *Marine Bank of Chicago* v. *Rushmore,* 28 Ill. 463, etc.

Admitting that a general deposit of money with a bank is, in a strict technical and legal sense, a loan, it does not follow that that is the sense and meaning of the word loan as used in this statute. Such a deposit of money is not in the ordinary and popular sense a loan of the money, and we are satisfied that the words "loaning" and "loan," employed in this statute, were used in their popular sense, and not in the strict legal meaning to include a bank deposit. It is not simply the loan of the money, but the "use by way of loan," which is prohibited and made a penitentiary offence, and it can not be supposed that the use of the money by way of loan was considered as embracing the case of a deposit of the money in a bank for safe keeping. As said in *Maillard* v. *Lawrence,* 16 How. 256, the popular or received import of words furnishes the general rule for the interpretation of public laws as well as

of private and social transactions. The crime of embezzle-
ment denounced by the statute we do not regard as having
been committed here.

The act recognizes the propriety of such a mode of keeping
and taking care of the public funds, by deposit in bank under
direction of the common council, as to the manner, conditions
and rate of interest. It is insisted, that in the absence of
such direction from the city, the deposit would be illegal, and
that the bond providing for its return is also illegal. It is
some evidence that Gage was not acting without authority of
the common council in the premises, that he got the bond
from Holmes for the purpose of submitting it to the finance
committee of the common council. But if Gage did act with-
out such authority, his doing so would seem to be a matter
between him and the council, and that the absence of the
authority should not relieve the bank of its duty to return
the money when called for, or constitute a defence to the bond
in suit.

The treasurer is further required by the statute to keep the
city money separate from his own and not to use the same
directly or indirectly, and it is said there was here a use of
the money by the treasurer, by carrying his own paper in the
bank with the deposit. The having of a deposit of that
amount may have been an object of interest with the bank
and have influenced the accommodation extended to Gage.
But any agreement that this money of the city should remain
and be held as security for the payment of Gage's indebted-
ness would have been of no validity, and the agreement made,
whatever it was, does not appear to have stood in the way of
any call for the money, further than that it was suffered to
remain until June 30, 1873, when $25,000 of the deposit was
paid upon the check of Gage, notwithstanding the agreement,
and that Gage then stood liable as guarantor upon the Reed
& Sherwin paper.

True, Holmes says that he did not feel any obligation to

pay it, but he thought it good policy to pay it, and paid it to save the credit of the bank.

This conclusion might well have been come to in view of such an agreement having no legal validity.

All the arrangement that there was seems to have been to let that amount of money remain on deposit if the bank would accommodate Gage. There was nothing in that, that interfered with the safe keeping of the money.

The interest appears to have been paid to Gage monthly until the bank suspended, which he may have misappropriated to his own use, but this so far as appears was without the knowledge of the bank.

There may have been irregular and censurable conduct of Gage in mixing up public with private business, but we can not think it should have the effect of vitiating this bond. Its condition requires nothing illegal, but guarantees that the bank shall simply perform its duty, which, in law, it was, in any event, bound to perform, viz, to pay over the city money thus being in deposit, to the city treasurer when demanded. It was not part of any scheme to violate the law, or to misappropriate the public moneys, but a guaranty that the money should be paid over to the party to whom it rightfully belonged. If an illegal scheme had, in fact, been entered into, and the bank had obtained this money of the city wrongfully, it would not be contrary to law for the bank to pay back the money to the city through its legal representative, the city treasurer, nor for others to engage that it should do so. This was just what the bank ought to do. There would arise an implied promise on its part to do it; and why might not an express engagement by another person, that the bank should perform this, its implied promise, be valid? Authorities are not wanting to the point, that money which has been paid on a contract prohibited by statute, may be recovered back. As in *White* v. *Franklin Bank,* 22 Pick. 181, it was held that where, upon the deposit of money in a bank, upon an agreement that it should remain for a certain time, the agreement was illegal

and void under the statute of the State, as being a contract by the bank for the payment of money at a future day certain, and that no action could be maintained by the depositor against the bank upon such express contract, but that he might recover back the money in an action founded on an implied promise. And in *Curtis* v. *Leavitt*, 15 N. Y. 291, where negotiable bank certificates of deposit for a loan payable on time, in violation of the statute in that respect, were given, it was held that the lenders were entitled to recover the money lent, and in reference to the question the court say: " There can be no difficulty in a case like the present, for another reason; the bank had a right to receive money on deposit —that is, to borrow money payable on demand; and its contracts to borrow the money in question on time being void, the law may properly regard the money as deposited, and the bank as liable to repay it whenever called for. An *express contract* by parol to that effect would no doubt be valid."

Here, there is but such an express contract for repayment. And see *Bradley* v. *Ballard*, 55 Ill. 413.

The principle " *ex turpi contractu actio non oritur*" does not seem to us to have any just application to this case. The city was not the offending, but the wronged party, if wrong there was, and there is no reason why it should be mulcted by the destroying of its security, and the loss of its money. Whatever provision of the statute or principle of public policy is supposed to have been violated, was for the protection of the city, and the bond is in furtherance of the same purpose, the city's protection.

The bond, though to Gage, was to him "as treasurer," and was really for the benefit of the city, and the suit is being prosecuted for the use of the city. Though the enforcement of payment of the bond may inure to the benefit of Gage by the discharge of a claim to the city which he is under liability to pay, still, the object of the bond is for the city's own benefit and protection. We can not think that there is any rule of law or principle of public policy which requires that it

342    COMSTOCK *et al. v.* GAGE, USE, ETC.    [Sept. T.

Opinion of the Court.

should be held that Gage, by any irregularity or failure in the discharge of his duty, or by any fraudulent or illegal collusion with the bank, has rendered these public funds incapable of being collected from the bank, or has rendered illegal and incapable of being enforced the very security taken for the protection of those funds, and to secure the safe return of the money to the city through its treasurer, and which it was the right and duty of the city council to exact.

As to the suggestion that there was no consideration for the bond, if it be admissible, as claimed, to deny the consideration under our statute, the deposit of the money and allowing it to remain as it did, was ample consideration.

The exclusion of the proffered evidence of the offer to Gage of the orders of the city of Chicago on its treasurer and money to the amount of the deposit, was manifestly proper. The orders were not legal tender and the city was not obliged to accept them.

It is objected that the verdict and judgment should have been as well against the defendant Butters, as against the appellants, inasmuch as his discharge in bankruptcy purports to discharge him from debts existing October 23, 1873, the time he was adjudicated a bankrupt, and that there was no breach of the bond until after that time. At the time of the trial, May 3, 1877, the estate of the bankrupt was still open, the assignee not discharged, and no dividend declared.

The Bankruptcy act provides, that when the bankrupt is bound as surety upon any bond, but his liability does not become fixed until after the adjudication of bankruptcy, the creditor may prove the same after such liability becomes fixed, before the final dividend is declared; and that a discharge in bankruptcy, duly granted, releases from all liabilities which were or might have been proved against his estate in bankruptcy. U. S. Rev. Stat. §§ 5069, 5119. The liability on this bond became fixed January 1, 1874, no final dividend in his estate had been declared May 3, 1877, the time of the trial, and the liability might have been proved in bankruptcy at any

time between the last two dates. His discharge released him from any liability which might have been proved against his estate in bankruptcy, and, therefore, from any liability on his bond.

The judgment must be affirmed.

*Judgment affirmed.*

Mr. JUSTICE DICKEY, having been of counsel for the city, took no part in the decision of this case.

Mr. JUSTICE MULKEY, dissenting:

Upon the consideration of this case for a rehearing, a majority of the court adhere to the views expressed in the foregoing opinion. Having participated in its consideration upon the rehearing, I feel impelled, from a sense of duty, to present my views upon one of the questions therein discussed.

Without expressing any opinion as to the correctness of the general conclusion in this case, I am unable to concur in one of the positions assumed by the court in reaching that conclusion; and believing, as I do, it is in direct conflict with law and correct practice in the trial of causes, as laid down by the best elementary writers, and the decisions of this and other courts of high standing; and believing, if the position in question is once firmly established, it will greatly confuse and obstruct the administration of the law, and often result in wrong and a complete denial of justice, I deem it a duty to dissent from that position and state my reasons for doing so.

Appellants offered to show, on the trial in the court below, that they executed and delivered the bond sued on to Holmes upon the express condition and understanding that it was not to be delivered to Gage till signed by all the directors of the bank, and that, in violation of this condition and understanding, the bond had been delivered to Gage, without the signature of William H. Adams, who was at the time one of the directors of the bank.

The court below refused to allow appellants to make proof

of these facts, and the exclusion of this testimony is one of the errors relied on for a reversal. The action of the court below, in excluding this testimony, is sustained by a majority of this court, upon two grounds:

First, That the facts proposed to be shown would not, of themselves, constitute a defence. Second, That there was no offer to show or prove that Gage had notice of these facts.

That the facts proposed to be shown would not, of themselves, constitute a defence, is unquestionably true. But is that a sufficient reason for excluding the testimony? I had always supposed that it was sufficient, if evidence *tended* to prove the issue, or, in other words, tended to prove the plaintiff's claim or charge or establish the defendant's defence. If a bond be executed and delivered by the maker to an agent with instructions not to deliver it to the obligee until some other specified person shall sign it, and the obligee has notice of the maker's instructions, he will have no right to receive the bond until they have been complied with; and if he does so, he can not maintain an action upon it unless the maker shall subsequently, in some manner, ratify the act of his agent, or otherwise so conduct himself as to estop him from setting up the defence. That this proposition is true, I presume no one will question.

It therefore follows, that if, under the circumstances supposed, the maker is sued on the bond, he makes out a *prima facie* defence by showing, first, the maker's instructions to his agent; second, the delivery of the bond in violation of the instructions; third, that at the time of the delivery the obligee had notice of the maker's instructions. Now, these three facts, let the order of proof be what it may, constitute a *prima facie* defence to the action, but the natural and logical mode of presenting them to the court and jury would be to prove them in the order of their occurrence as I have just stated them, and there is no question in my mind but that the court in the exercise of its discretion would have the right to require them to be proved in the order mentioned.

The case under consideration, like the one supposed, was a suit upon a bond. The makers, on the trial in the court below, offered to prove the first fact in this line of defence, namely, that the bond was signed upon the condition that it was not to be delivered until all the directors of the bank had signed it. This fact was the first in the series which constituted the defence, and was offered in the natural and logical order above stated. The court, without assigning any reason therefor, excluded the evidence. Was the fact proposed to be shown of a purely collateral character, so that the trial court could not see its bearing upon the case before it? If so, it was properly excluded from the jury—otherwise it was not. Can any lawyer, however humble and inexperienced, have a doubt as to the purpose of this testimony? I think not. It must be conceded that the object in offering it was apparent. Hence there was no necessity of informing the court. I do not at all question the rule that where a fact purely collateral is offered in evidence, if objected to, it is the duty of the party offering it to point out its materiality, and if he does not do so, it is the duty of the court to exclude it. I also admit the rule to its fullest extent, that where a party is called upon by the court to state the purpose for which a certain fact is offered whose relevancy is not obvious, it is his duty to do so, and if he refuses, the court has a perfect right to reject it.

So, also, while courts do not ordinarily interfere with the order in which testimony is produced, when its pertinency is apparent, yet I concede they have the right, where the evidence relied on, in support or defence of an action, consists of a number of dependent facts or links in the chain of testimony, to require them to be produced in their natural and logical order, or, in other words, in the order of their occurrence, and if this requirement is not complied with, the court may reject the testimony. This, however, is conceding more than the decisions of this court or the authorities generally warrant.

But where the evidence, consisting of a number of dependent facts, or links constituting a chain of testimony, is offered

in its natural and logical order, and its relevancy is apparent,
I deny the right of the court to exclude it merely because the
first fact offered is not accompanied with a statement that the
subsequent facts or links in the chain will also be put in evi-
dence.

And this brings me to the second reason assigned by the
court for holding there was no error in excluding the tes-
timony offered by appellants as above stated. As already
appears, appellants proposed proving that the bond sued on
had been delivered to Holmes upon the express condition that
it was not to be surrendered to Gage till all the directors of
the bank had signed it. To prove this fact, was the first step
towards making out a complete defence. That it tended to
prove the issue, was manifest.

To make the defence complete, two other facts had to be
proved, two other steps taken, but only one could be proved
or taken at a time. Why not allow the first step to be taken,—
the first fact to be established in its order? A majority of
the court say, because appellants did not, at the same time,
offer to prove the other two facts, namely the delivery of the
bond to Gage, without performance of the condition, and that
he (Gage), at the time, had notice of the condition upon which
the bond was to be delivered. But why should this offer
have been made as a condition precedent to proving the first
fact? Surely not to enable the court to see the drift or rele-
vancy of the testimony actually offered, for a mere novice in
the law could see that. And if it was not necessary for that
purpose, I am unable to see any good reason for requiring
such an offer.

Had the court supposed that counsel was not acting in
good faith, and that there was no purpose of following up
the fact offered to be proved with proof of the other facts,
depending upon that one and necessary to make the one offered
available, it was but just to counsel to have asked him if he
was prepared to prove the dependent facts, and if counsel had
admitted that he was not, or that he had no purpose of doing

so, then it would have been proper to have rejected the testimony.

There are some adjudicated cases decided by this court which may be supposed to sustain the view expressed by the majority of the court, but I am satisfied that a careful examination of them will demonstrate that they do not. On the contrary, it will clearly show that the view in question can not be maintained.

*Lombard* v. *Cheever et al.* 3 Gilm. 469, was an action of replevin for certain boats which the plaintiff claimed had been forfeited to him as the owner of a ferry. On the trial, the court below excluded from the jury the license of the plaintiff to keep a ferry, and this court, in reviewing the action of the court below, in excluding the license, said: "The object of the plaintiff, in offering this evidence, as explained by the bill of exceptions, was a legitimate one. He claimed to be proprietor of a ferry, and that the boats replevied by him, having been run by the defendant in derogation of his rights, were forfeited to him. It consequently became material for him to prove his title to the franchise claimed. Such proof was not made by the mere production of the license. It should have been preceded or at least accompanied by proof of the order of the county commissioners' court granting it. * * * Then, though the license is a necessary link in the chain of title to the ferry franchise, and that offered by plaintiff, being regular on its face, was for such purpose legally admissible, it does not follow that it was erroneously rejected. The true rule on the subject is, that although the court will not indicate to parties the order of the introduction of their testimony, yet, when evidence is offered of any fact which, in the order of its occurrence, must have been preceded by some other fact, without proof of which the evidence offered is wholly insufficient for the purpose for which it is introduced, it should be received only on the assurance of the party offering it that such other proof will also be made. If it should not be, the court, on motion of the opposite party, will exclude such testimony, or

instruct the jury that it is insufficient to entitle the plaintiff to a verdict."

The case just cited is not, in principle, like the one now under consideration, and does not at all sustain it, but, on the contrary, the rule therein laid down is in direct conflict with it. The fact which appellants proposed to prove in this case, and which was excluded by the court, was not one which, in the order of its occurrence, must have been preceded by some other fact upon which it was dependent, but, on the contrary, it was the first in the order of occurrence, and its probative force did not at all depend upon any fact preceding it. The truth is, appellants were proceeding in strict conformity with the rule laid down in that case. Under the rule in that case, so long as a party offers the facts in the order in which they occurred, he is not bound to make any statement to the court with reference to what he expects to prove. It is only when he passes by a fact in regular sequence, and proposes to show some other fact in the chain of testimony whose probative force depends upon the fact thus passed by, that he is bound under the rule to make a statement to the court as to what he expects to prove.

It is quite apparent, as already stated, that the rule now laid down is in direct conflict with the rule laid down in that case. Let us look at it. Here is a defence consisting of three connected facts, following each other in regular sequence. It takes them all to make the defence complete, yet each fact has a separate probative force that tends to make out the defence. The rule in *Lombard* v. *Cheever et al.* says, these facts must be offered in the order of their occurrence, and if not so offered, the party offering the testimony must make a statement to the court, showing that the link or links in the testimony which he proposes for the present to pass over, will be subsequently proven, and if he fails to make such statement, the fact or facts so offered out of their order may be rejected by the court.

Now, this is clearly the rule in *Lombard* v. *Cheever et al.* If, then, no statement is required where the facts are offered in the order of their occurrence, the conclusion is irresistible

that the court below erred in excluding the evidence in question, for it will not and can not be denied that the fact first offered in evidence was first in occurrence.  It follows, therefore, the case last cited, so far from supporting the view of the majority of the court, is an authority directly against it.

*Lonergan* v. *Stewart,* 55 Ill. 44, is also supposed to sustain the rule laid down in the case now under consideration, but I do not view it in that light.  Lonergan deposited a lot of corn with Bradt, who was the owner of a warehouse in which the corn was stored.  Bradt failed, and Stewart succeeded him in the possession of the warehouse and its contents, including the corn in question.  After the transfer to Stewart, Lonergan demanded the corn of him, and, on his refusal to deliver it, brought an action of trover to recover its value.  On the trial in the circuit court, Lonergan offered in evidence a receipt for the corn, executed by Bradt at the time of the delivery of the corn to him, and it was held by this court that the court below properly excluded it from the jury.  And in speaking of this receipt, and its exclusion from the jury, the court say: " It was not executed by the defendant, and no foundation had been laid for its introduction, nor was the offer preceded by any statement that the defendant would be connected with it by proof.  The relevancy at the stage of the cause at which it was offered was not shown, *and was not apparent.*  It was in the discretion of the court to admit it or not."

There is nothing in this case but what is in perfect harmony with the view I have already expressed.  Here, a receipt executed by a stranger was offered in evidence against the defendant.  For aught that appeared, it had no connection in the world with the case, and it was therefore properly excluded.  So, I say, in all cases where the court can not see the relevancy of testimony, and no statement is made by the party offering it showing its relevancy, the court, in its discretion, may exclude it.  Indeed, the rule laid down in this case is, perhaps, of more frequent application than any one known to the law relating to the production of testimony.

It is universally true, that where the pertinency of evidence is not apparent, and its relevancy is not pointed out, the court will, on motion, exclude it. This is the principle which the case announces, and I presume no one would question it for a moment, for it is to all lawyers as familiar as household words, and as old as the law of evidence.

In *City of Alton* v. *Hartford Fire Insurance Co.* 72 Ill. 328, which was an action to recover a penalty imposed by an alleged ordinance, the court below excluded from the jury the ordinance upon which the action was based, on the ground that plaintiff had shown no authority in the city to pass it, and this court, on error, sustained the ruling of the court below. This case differs materially from the one last cited. Here the relevancy of the testimony was apparent, but it was not offered in the order of its occurrence. The validity of the ordinance was wholly dependent upon the fact whether or not the city had been clothed with power to pass it.

It affirmatively appears in that case, that the defendant denied the power of the city to pass the ordinance, and objected to its introduction for that reason; and the plaintiff failing or refusing to show the requisite power to pass the ordinance, it was, of course, properly excluded. It is evident, therefore, that this case is not at all analogous to the one under consideration, and the latter is not, in any sense, supported by it.

It will be further perceived, that the proof offered was not presented in its natural order, or, as expressed in the case of *Lombard* v. *Cheever et al. supra,* it was not offered in the order of its occurrence. The fact offered to be shown—namely, the existence of the ordinance,—without proof of power to pass it, would have had no probative force whatever. Now, had the plaintiff first offered to show the authority of the city to pass the ordinance, and the court had excluded it because the plaintiff did not, at the same time, inform the court that plaintiff intended to follow up this evidence by proof of the passage of an ordinance by the city, in pursuance of the power, the cases would be analogous. The one cited is not of the kind sup-

posed, and I confidently assert that no case can be found decided by this court, or any other court of equal standing, sustaining the rule laid down in the present case.

The foregoing are all the authorities to which my attention has been called, and which it has been suggested favor the rule under consideration, and I am willing to submit them without further comment.

The rule laid down by Mr. Greenleaf on this subject, in his work on Evidence, is expressed in these words: "It is not necessary, however, that the evidence should bear directly upon the issue. It is sufficient if it tends to prove the issue or constitutes a link in the chain of proof, although, alone, it might not justify a verdict." And with respect to evidence whose relevancy is not apparent when offered, he adds: "Nor is it necessary that its relevancy should appear at the time when offered, it being usual to receive, at any proper and convenient stage of the trial, in the discretion of the judge, any evidence which the counsel shows will be rendered material by other evidence which he undertakes to produce. If it is not subsequently thus connected with the issue, it is to be laid out of the case." 1 Greenlf. (12 ed.) page 62, sec. 51 a.

In *Haughey* v. *Strickler*, 2 Watts & Serg. 411, where a partnership note had been admitted to the jury before (as it was claimed) the partnership of the defendants had been established, the Supreme Court of Pennsylvania held there was no error, saying: "This was rather a question as to the order of giving evidence than its admissibility. Distinct matters forming separate links in a connected chain of title often can not be conveniently given in evidence together. It is no answer to evidence that it does not prove the plaintiff's whole case. If it is a link in the chain of the evidence afterwards to be given in, it is admissible." To the same effect are the cases of *State* v. *McCallister*, 11 Shepley, 139; *Johnson* v. *Warden*, 3 Watts, 104; *Tams* v. *Bullitt et al.* 35 Penn. 308; *Lake* v. *Mumford*, 4 Smedes & Marsh. 312.

The case of *Bartlett* v. *Evarts*, 8 Conn. (old series) 523, is
exactly in point, and supports the view I have taken.   There
the establishment of two facts was necessary to make out the
case, namely: that certain posts and rails were erected, and
that they were erected by the defendant.   The plaintiff offered
to show, first, the fact of erection, but the court below rejected
the testimony, and it was held error.   It is to be observed
that the evidence was offered in its natural order, and, as in
this case, its relevancy was apparent.   Mr. Wharton, in his
work on Evidence, (2d ed.) vol. 1, sec. 21, says: "Hence, it
is relevant to put in evidence any circumstance which tends
to make the proposition at issue more or less improbable; *nor
is it necessary,* at once, to offer all the circumstances necessary
to prove such proposition.   The party seeking to prove or
disprove the proposition may proceed step by step, offering
link by link."

*Dunning et al.* v. *Matthews,* 16 Ill. 308, was an action of
trespass *quare clausum fregit.*   The defendants in the court
below justified under certain proceedings in the county court
authorizing the location of a highway over the *locus in quo.*
The papers and files in that proceeding which were offered in
evidence failed to show that all the requirements of the statute
had been complied with, and the evidence was objected to on
that ground.   The court thereupon stated to counsel, that if
it was proposed to follow the testimony offered with proof that
the other provisions of the statute had been complied with,
the evidence offered might go to the jury; but the defendants,
on being thus called on by the court, refused to make such
further proof, and the court thereupon excluded the testi-
mony, and this court held there was no error in doing so.   If
any such rule existed as is now contended for, the case cer-
tainly afforded a very opportune occasion for its announce-
ment, but it was not done; and that decision is placed upon
the express ground that the defendants did not, when their
attention was called by the court to the insufficiency of the
facts proposed to be shown, and the necessity of supplementing

them with other facts in order to make out a defence, pretend to be able to supply the wanting links in the chain of testimony, or make any offer or explanation with reference thereto. Under the circumstances it would have been a useless consumption of time to have gone on to prove a part of the facts constituting the defence, when it was substantially admitted that the residue of the facts would not or could not be proved. If, as a matter of law, the defendants in that case were bound to state, in the first instance, without any request to do so by the court, all the facts constituting their defence, at the peril of not being permitted to prove anything, it is somewhat remarkable that the court did not place its decision upon that ground.

In *Hough* v. *Cook*, 69 id. 581, this court, in discussing the relevancy of testimony, lay down the rule in these terms: " To determine the relevancy of evidence, the question is, not whether it was sufficient of itself to make out the defence, but would it tend to prove the defence."

*Willoughby* v. *Dewey*, 54 id. 266, was an action brought by plaintiff in error as constable, against defendant in error, for the price of a field of growing wheat sold under execution. On the trial below, the plaintiff, for the purpose of proving the judgment upon which the execution issued, offered in evidence the justice's docket containing the judgment.

This evidence was excluded by the court on the ground that it was not first shown that the justice had jurisdiction to render the judgment. And this was held to be error. The court say, " the objection here made is, that the docket, if admitted, would show only the judgment, but would not show that the magistrate had jurisdiction of the subject matter or of the person sued. Should that be so, it would not render the docket incompetent evidence. Competency of evidence is one thing, what it may prove is entirely another thing." The evidence here was offered in its natural order, or, in other words, in the order of its occurrence.

The case of the plaintiff consisted of a chain of facts: First, the judgment; second, the execution; third, the sale; fourth, the purchase by the defendant. If the rule now laid down by this court is the law, the case just cited ought not to have been reversed. The court ought to have sustained the ruling of the court below, in excluding the justice's docket, on the ground the plaintiff did not, at the same time he offered the docket in evidence, inform the court that he expected to follow up the proof of the judgment by showing the execution, the sale and purchase by the defendant. To have proved all these facts would have shown the justice had jurisdiction at least of the subject matter. It is very clear the judgment in this case would no more have established the plaintiff's claim for the price of the field of wheat, than proof that the makers of the bond in question delivered it to Holmes with instructions not to deliver it to Gage till all the directors had signed it would have constituted a defence to the bond.

The two cases are precisely alike in principle, and I insist the latter case ought to be controlled by the former, not only on the ground of precedent but on the ground of reason and convenience.

But, going further back in the line of decisions of this court upon the question under consideration, I invite attention to the case of *Rogers* v. *Brent*, 5 Gilm. 575. This case was an action of ejectment wherein the defendant in the court below had offered in evidence a certificate of the register of the land office, showing a purchase from the government of the land in controversy by one Bowman, through whom defendant claimed. This evidence was excluded by the court below, and it was held error.

In passing upon the question the court say: "It only remains to be seen whether the evidence which he offered, and which was excluded by the court, tended to prove such a case: for, according to Mr. Greenleaf, the court was authorized to exclude all evidence of collateral facts, or those which are incapable of affording any reasonable presumption or inference

as to the principal fact or matter of dispute." "Was the evidence offered incapable of affording such reasonable presumption or inference? On the contrary, it was the very foundation of the case, which it was competent for him to prove. Without it, all other evidence would have been useless. Without it, it would have been impossible for him to have made out his proposed defence. The question is not, whether it was sufficient of itself to make out the defence, but would it *aid* to make out the case;—would it tend to prove the defence? Most cases have to be proved by a succession of distinct facts, neither of which, standing alone, would amount to anything,—while all, taken together, form a connected chain and establish the issue, and, from necessity, a party must be allowed to present his case in such detached parts as the nature of his evidence requires. *It would be no less absurd than inconvenient, when proof is offered in its proper order of one necessary fact, to require the party to go on and offer to prove at the same time all the other necessary facts to make out the case. Such a practice would embarrass the administration of justice and prove detrimental to the rights of parties."*

This case is in point, and in direct conflict with the rule laid down by the court in the present case. That which the case cited declares to be absurd, the court now lays down as a rule in all future cases. And this is done even without a reference to the case which holds that such a rule would be absurd; and, indeed, without reference to any case that supports the rule now laid down.

Going still further back, I find that the same rule laid down in *Rogers* v. *Brent,* is distinctly announced in the case of *Hulick* v. *Scovil,* 4 Gilm. 168. This court, in discussing the very question now under consideration, say : " Testimony, if relevant, may be properly received, although in itself insufficient to show good ground of recovery or defence, as the case may be, and where its deficiency may be supplied by other proof, as, for instance, a sheriff's deed, which, to show title, must be accompanied by evidence of a judgment and execution; or, the

ordinary case of a series of deeds to show title. *In such case it is not necessary to exhibit the entire chain of evidence at a single view,* but, from the very nature of the case, it must be extended progressively. The question is not as to the sufficiency of the link offered and its associate links to complete the chain, or endue it with the necessary strength for its intended purpose, but *simply as to its adaptation to the composition of the proposed chain.* Nor will the court undertake so to control a party endeavoring to make out his chain of title, as to require that each link be the regular sequence of that next preceding in the order of the evidence. When, however, the whole evidence on the subject has been heard, if the court consider it insufficient they may, on the application of the party against whom it is offered, either exclude it, or instruct the jury it is insufficient to maintain the action or defence, as the case may be."

It is evident that the doctrine of this case can not be harmonized with the rule which the court now lays down. Indeed, no effort is made to do so. Nor is there even so much as a passing reference made to this case, or any of the other cases which I have cited announcing, in substance, the same principle.

Now, I submit, with all deference to the majority of the court, that where a rule, governing the production of testimony, has been announced in plain, emphatic, and unmistakable terms, as was done in the two cases last cited, if it becomes necessary to change such rule by judicial decision, it is due to the cause of jurisprudence, to the court itself, and an enlightened bar, that the reasons for doing so should be distinctly stated, and that the cases establishing the rule should be in express terms overruled.

Believing that the rule now laid down is unsupported by any previous decision of this court, but, on the contrary, is in direct conflict with a number of well considered cases, as I have fully shown; and feeling assured that it must, sooner or later, be repudiated, for the reason that it would be impossible to enforce it without leading to great delays and confusion in

the trial of causes, and often in palpable injustice, I can not give my assent to it.

Mr. JUSTICE SCHOLFIELD: I concur in the foregoing views of Mr. JUSTICE MULKEY.

Mr. CHIEF JUSTICE WALKER: I think the whole question is fully determined by the cases of *Lombard* v. *Cheever*, 3 Gilm. 469, *Lonergan* v. *Stewart*, 55 Ill. 44, *City of Alton* v. *Hartford Fire Ins. Co.* 72 id. 328, and others in our reports. They show that evidence offered by a party, not in itself pertinent to the issue, may be rejected, unless the party proposing to introduce it shall offer to follow it up with evidence which shall render it pertinent. There was no such offer in this case, and the presumption that the judge decided correctly has not been overcome. There are cases that hold that an action in ejectment is an exception to the rule, but this is not such an action.